Mary **LINCOVICH**

v.

The **SECRETARY OF HEALTH, EDUCATION AND WELFARE OF the UNITED STATES.**

**Civ. A. No. 75-166.**

United States District Court, E. D. Pennsylvania.

Aug. 13, 1975.

Ralph M. Bashore, Pottsville, Pa., for plaintiff.

Robert E. J. Curran, U. S. Atty., William J. McGettigan, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

## OPINION

GORBEY, District Judge.

The plaintiff, Mary Lincovich, widow of Andrew Lincovich, filed an Application for Survivor's Benefits on August 7, 1970, under the Federal Coal Mine Health and Safety Act, as amended, based on the coal mine employment of her deceased husband. After terminating his employment as a miner because of his health, he obtained a truck which he used to haul coal which was loaded and unloaded mechanically. On May 17, 1951, while at a mine to obtain coal, he entered the mine in an unsuccessful attempt to rescue a miner who had been caught underground. Both died as the result of suffocation due to inhalation of carbon monoxide.

On December 24, 1970, the claim was denied by the Department of Health, Education and Welfare, on the ground that death was not due to pneumoconiosis. Plaintiff filed a request for reconsideration and the claim was denied on September 22, 1971. On February 25, 1972, plaintiff requested a hearing before an Administrative Law Judge. Subsequently, the Federal Coal Mine Health and Safety Act of 1969 was amended by the Black Lung Benefits Act of 1972, which, *inter alia,* provides for the payment of benefits in respect of the death of any miner whose death was due to pneumoconiosis, *or who at the time of his death was totally disabled by pneumoconiosis.* (Emphasis added.) 30 U.S. C.A. § 921(a).[1]

The Act defined total disability to mean:

"When pneumoconiosis prevents [a miner] from engaging in gainful employment requiring the skills and abilities comparable to those of any employment in a mine or mines, in which he previously engaged with some regularity and over a substantial period of time."

30 U.S.C.A. § 902(f).

Because of the aforesaid amendment, the case was again remanded for reconsideration under the new law, and on April 17, 1973, the plaintiff's claim was again denied. An application for the appointment of a hearing examiner was

1. See with respect to the Act generally, *National Independent Coal Operator's Ass'n. v. Brennan,* 372 F.Supp. 16 (D. D.C.1974).

made, and a hearing was scheduled for May 13, 1974. Plaintiff's attorney did not appear and a continuance was granted to enable the plaintiff to obtain another lawyer. On June 18, 1974, a new hearing was held. The following colloquy took place between the Administrative Law Judge and the plaintiff:

"Adm. Law Judge: Now, a hearing was originally scheduled for May 13, 1974. You appeared at that hearing and stated that you were unaware that your attorney would not be present at the hearing.

"You then requested that the hearing be continued to allow you to obtain another attorney to properly present your case at a future hearing. The hearing was then rescheduled for today, June 18th, and that is why we are here today.

"Now, I note that again you are without an attorney.

"Claimant: Yes.

"Adm. Law Judge: Do I understand that you wish to be—you wish to have your case go along without representation?

"Claimant: I guess I'll have to. I don't know what else I can do."

Tr. 27–28.

The hearing proceeded and the Administrative Law Judge denied the claim on August 16, 1974. Request for review was made to the Appeals Council of the Department, and on November 22, 1974, the Appeals Council affirmed the decision of the Administrative Law Judge and denied the plaintiff's application for benefits. Thus, the decision of the Administrative Law Judge became the final decision of the Secretary.

On January 21, 1975, plaintiff filed an action in this court, pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g) and incorporated by reference through Section 413(b) of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. § 923(b), to review a final decision of the Secretary of Health, Education and Welfare, disallowing a claim for survivor's benefits under the Black Lung Benefits Act of 1972.

Under 42 U.S.C. § 405(g) this court has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." It further provides that "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . .".

Defendant has filed an answer and as a part thereof a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. Subsequently, plaintiff has filed a motion for summary judgment, supported by a memorandum, five affidavits and a certification by a physician. Defendant has also filed a motion for summary judgment supported by an excellent and thorough brief in support thereof.

The controversy concerns two of the basic issues to be determined by the Administrative Law Judge, which were, whether the plaintiff's deceased husband had pneumoconiosis, and if so whether he was totally disabled as the result of it at the time of his death on May 17, 1951.

The record shows that two physicians, Dr. Stein and Dr. Bankis, who had treated plaintiff's husband, were both dead. Tr. 46. It also shows that he had gone to another physician. Exhibit 12 in the record is a medical report on a form provided by the Department of Health, Education and Welfare. The form, under the topic "History" stated:

"Please include the history of symptoms, such as dyspnea, and the clinical course of any cardio-pulmonary disease(s) with therapy and response."

Over the physician's signature were the written words:

"I have no evidence in x-ray or breathing test that this man had silicosis."

Thus, the hearing started with the plaintiff not represented by a lawyer and with no other witnesses present. Of course, she could testify with respect to the issue of "total disability" but even if her testimony were to be adequate on that issue, if believed, there would be slight possibility of proving entitlement to widow's benefits on the basis of any testimony she might give as to the issue of pneumoconiosis, if the contents of Exhibit 12 be interpreted by the Administrative Law Judge as a medical opinion that Mr. Lincovich had no respiratory disease.

Unfortunately, no x-ray reports were in existence, no medical documents or evidence such as biopsy or autopsy were available, hence the only reasonable possibility of proving the condition would be through the testimony of co-workers or others who had knowledge of his condition and the symptoms of the dread disease, so familiar to residents of coal mining communities.

■ Hearings under the Social Security Act are non-adversary. *Blanscet v. Ribicoff,* 201 F.Supp. 257 (W.D.Ark. 1962). Furthermore:

"Rights and privileges are an issue and (when) the guiding hand of counsel is not present to advocate their existence, a duty devolves on the Hearing Examiner to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts surrounding the alleged claim of right or privilege."

*Hennig v. Gardner,* 276 F.Supp. 622, 624–625 (M.D.Tex.1967).

Pages 44 to 48, inclusive, of the transcript show the results of the "probing" into all of the relevant facts relating to the existence of pneumoconiosis. Its complete inadequacy becomes immediately apparent when considered in connection with the statement in the brief in support of defendant's motion for summary judgment at page 8:

"Since the deceased miner worked some 18 years in mine employment, he will be presumed disabled due to pneumoconiosis arising out of that employment if evidence establishes (1) the existence of a chronic respiratory impairment that (2) prevented him from engaging in mine work or comparable work."

Plaintiff's testimony that her husband had terrible coughing spells, coughing up black phlegm, and loss of weight was not followed by questions from the Administrative Law Judge to find out if there were other symptoms which are normally found in persons suffering from black lung disease. Plaintiff's testimony in regard to the existence of a chronic respiratory impairment was given very little significance by the Administrative Law Judge, because of his interpretation of the words used by the physician in the medical report, Exhibit 12, as shown on page 47 of the transcript:

"Q When _____ says that your husband didn't have any respiratory disease or any thing."

Thus, it is not surprising that the Administrative Law Judge in his evaluation of the evidence wrote:

"The claimant has testified that her husband had coughing spells and spit up black phlegm. Other than these statements by the claimant, there is no evidence whatsoever in support of her contention that her husband had pneumoconiosis, at the time of his death . . ."

Tr. 9.

In a situation such as this and with a record so barren of evidence with regard to an issue upon the determination of which depends a plaintiff's right to the presumption based upon the 18 years in mine employment, it is only a matter of simple justice that if there is to be a final denial of benefits, it should be on the basis of a record which covers thoroughly the issue as to the existence of a chronic respiratory impairment and the issue with regard to inability to do work involving the skills and abilities utilized during the 18 years of mine employment.

It is also apparent from the record that the Administrative Law Judge improperly evaluated the evidence with respect to whether decedent was totally disabled at the time of his death. He wrote:

"Because Mr. Lincovich was *engaged in work* at the time of his death, and did not have 'complicated' pneumoconiosis, there is no basis for finding that he was totally disabled at the time of his death."

(Emphasis added.)

Tr. 9.

Under the relevant statute the test of total disability is "when pneumoconiosis prevents him from engaging in gainful employment *requiring the skills and abilities comparable to those of any employment in a mine or mines in which he previously engaged with some regularity and over a substantial period of time.*" (Emphasis added.)

 In view of the statutory definition of total disability and the administrative regulation relating to it, the record should clearly establish the type of work and the skills and abilities involved in it which deceased performed as a "miner as that term is defined in the Act and was so employed for a period of 18 years". (Finding of Fact no. 2, Tr. 9). Plaintiff's testimony in this case is found in pages 32 to 50 of the transcript. Pages 35 to 43 relate to his employment as a miner both inside and outside the mine and for the period of self-employment. The questions, or lack of questions, with respect to the crucial issue are such as to justify the statement made in defendant's brief at page 9 that "aside from plaintiff's remark that 'when he worked in the mines he was doing real mining work, digging, and . . .' The record does not disclose what the decedent's duties as a coal miner involved."

From the evidence, it does appear that plaintiff's husband worked from 1926 to 1931 for the Reading Coal and Iron Company; from 1931 to 1936, for the Gilberton Coal Company, in the mines (Tr. 35, 36). Since not all work in the mines is identical and requires the same skills and abilities, a proper record should throw considerable light on that matter. But the record reveals:

"Q Now, when he worked in the mines, he was doing real mining work, digging, and—

A Yes, he worked with two other men, right from Brockton. That's where he was born, right in Brockton."

Tr. 37.

The record is also wanting with respect to the nature of his work from 1936 to 1944 when his eighteen years as a miner ended.

"Q And that was 1931 to 1936. Now, after 1936, you have a note here that he worked for the Newkirk Tunnel Company.

A Yeah. He worked for Norman Schuck (phonetic). He had—

Q Well, was that a coal company?

A I don't think he worked in there. I don't remember. Do I have that marked there?

Q You got it marked here—

A Yes.

Q —and you said his job was a trucker.

A Yes, trucking—but not—but I thought you meant in the mines.

Q Was this a mining company?

A Yeah, they haul the coal out.

Q Now what did he do—load and deliver it?

A Yes.

Q And that was till 1944? Now, what did he do after that?"

Tr. 36–37.

The record is equally as unsatisfactory as the evidence is developed to show the nature of the work from 1944 to 1951, when he was killed on a good Samaritan mission into a mine in an unsuccessful rescue attempt.

"Q And that was till 1944? Now, what did he do after that?

A Well, he had the truck.

Q Did he work for himself? Is that it?

A Yes, sir.

Q So, from 1944 to 1951, when he died, he was doing his own? .

A His own.

Q He was sort of self-employed then—"

Tr. 37.

Continuing:

"Q Now, the type of work that he did before he died, was that bootlegging coal? Is that what you mean? Is that what you call—

A He'd buy the coal. He never worked in a bootleg hole—you know what I mean?

Q But he would buy—

A But he would buy it—

Q —and sell it?

A He would buy it and sell it.

Q And that was the type of employment before he died?

A No, sir. Well yes. He had the truck—

Q Actually, he wasn't working for anyone then?

A No. For himself. He used to buy the coal from the—

Q Yeah.

A —so-called independent—

Q Now, what was—

A —mines.

Q —immediate cause of death?"

Tr. 38–39.

Later, reference is again made to the activity of the deceased for the years, 1944 to 1951, the period of self-employment.

"Q Now, along came the 1972 Law, which amended the 1969 Law, and provided for other ways for you to collect benefits, and that is, if we have established that this man was totally disabled from pneumoconiosis before he met with his accident. Now, from what you tell me, he wasn't totally disabled. He was actually going up and loading, and doing his job?

A No.

Q What was he doing?

A He didn't do that. My husband—not my husband. No, sir.

Q Well, what did he do?

A He was on his way down with a load of coal in his truck that he had gotten from another bootleg hole.

Q Well, he was doing work though. Your husband was working.

A No, just driving a truck. Hauling the coal.

Q When he hauled the coal—

A He was—

Q Well, when he hauled the coal, what did he do with it?

A Well, he drive down to the—sell it at a breaker down in Tamaqua.

Q What did he do with it there?

A Well, they had the breaker there that they dumped the coal.

Q In the dump truck?

A In the dump truck.

Q So, actually, he went up; he would load the coal—

A No, sir.

Q —or have somebody—

A They would have—they used to have those shovels that would load the coal—

Q —shovels and he used to really be a deliverer of the coal—

A Yes.

Q —after they loaded his truck—

A Yes.

Q Was it his own truck?

A His own truck.

Q He bought it—

A He bought the coal and sold it.

Q So, he would buy the coal; he would sell it. So he was actually engaged in some form of business or work.

A That was his only—

Q Which would mean now, he wasn't totally disabled. If a person is totally disabled, he cannot do any thing." (Tr. 42, 43).

The questions asked could hardly be expected to draw responses from the witness which would reveal the nature of her husband's work, while self-employed, the skill and activity required by it, as compared with the work in the mine and the trucking work outside the mine.

■ It appears, therefore, that there is not in the record substantial evidence[2] to support the finding that Mr. Lincovich was not totally disabled "from engaging in gainful employment requiring the skills and abilities comparable to those of any employment in a mine or mines in which he previously engaged with some regularity and over a substantial period of time . . . ".

The conclusion required is that the transcript of testimony shows a record that does not meet the requirements of *Hennig v. Gardner, supra.* On the two critical issues the paucity of the evidence is such that it cannot reasonably be concluded that plaintiff's denial of benefits rested upon a full and fair hearing.[3] *Gold v. Secty. Health, Education and Welfare,* 463 F.2d 38 (2d Cir. 1972).

The case should be remanded for another reason. Before the hearing closed, the Administrative Law Judge asked:

"Q. Is there any body else that you know of that is around that could have known your husband, what he was doing, the type of work he was doing?

A Pardon?

Q The type of work your husband was doing—is there any one who knows this condition, other than yourself?

A Yes

Q Who?

A My—most—his on his side, his family, sisters.

Q But they would say the same thing that you did?

A Well, I suppose they would."
Tr. 49.

It appears that plaintiff, now represented by an attorney, has discovered four persons, all miners, not related to her, who have knowledge of material facts. In support of plaintiff's motion for summary judgment are submitted the affidavits of four miners, three of whom worked in the mines with Andrew Lincovich, and all of whom are black lng victims, and are receiving benefits under the Act. Each has the same symptoms manifested by plaintiff's deceased husband as indicated by plaintiff's testimony, terrible coughing spells, spitting up black phlegm, and continued difficulty in breathing. Each believed that Andrew had black lung disease and knew that Mr. Lincovich had to quit the mines because of breathing problems and inability to do the hard work required of those who work in and about the mines.

Along with the aforementioned affidavits submitted by plaintiff is a certification of the physician whose report is attached to the transcript as Exhibit 12, a medical report in which he wrote: "I have no evidence in X-ray or breathing test that this man had silicosis."

The Administrative Law Judge interpreted that to mean that plaintiff's husband "didn't have any respiratory disease or anything" (Tr. 47), which would seem to be a reasonable interpretation, until we read the physician's certification as indicated in Exhibit "F" attached to plaintiff's brief:

"Sep. 4, 1975

To The Social Security Board or To Those to Whom It May Concern:
Dear Sir:

I, , MD, certify that I did not treat Andrew Lincovich for silicosis. My records show that I

---

2. "Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Toborowski v. Finch,* 363 F.Supp. 717 (E.D.Pa.1973) and cases there cited.

3. Using less legal terminology, a hearing held under such circumstances is as "useless as socks on a rooster." An expression borrowed from page 11 of the pamphlet "Are You Being Railroaded?" written by Public Affairs, Phillips Petroleum Company, Bartleville, Oklahoma.

have no reports on x-rays of the chest or laboratory tests for pulmonary function. No statement of mine was intended to indicate that he had or had not silicosis and any interpretation of such statement was incorrect. I state this to clarify the record so that the record is perfectly clear that I have never treated Mr. Andrew Lincovich for silicosis nor should any statement of mine be (sic) in this record be interpreted to conclude that Mr. Andrew Lincovich did not have silicosis."

By such certification the medical statement is characterized as cryptic, and therefore very unfair to his patient, as well as the Department of Health, Education and Welfare. Both plaintiff and the Department are entitled to a clarification of Exhibit "12" which has been asserted by its author to be ambiguous.

The cross-motions for summary judgment are denied, and the final decision of the Secretary of Health, Education and Welfare is hereby reversed, and this case is remanded to the Secretary of Health, Education and Welfare for further proceedings in accordance with this opinion.