744 F.2d 327
 Joseph F. ECHO, Petitioner,
v.
DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, United
States Department of Labor and Benefits Review
Board, U.S. Department of Labor, Respondent.
 No. 84-3019.
 United States Court of Appeals,
Third Circuit.
 Argued July 17, 1984.
Decided Sept. 14, 1984.
 
 Frank L. Tamulonis, Jr. (Argued), Zimmerman, Lieberman & Derenzo, Pottsville, Pa., for petitioner.
 Francis X. Lilly, Sol. of Labor, Donald S. Shire, Associate Sol., J. Michael O'Neill, Counsel for Appellate Litigation, Michael J. Ward, Jr. (Argued), U.S. Dept. of Labor, Washington, D.C., for respondent.
 Before ADAMS and BECKER, Circuit Judges and O'NEILL, District Judge*.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 Petitioner, Joseph F. Echo, was a coal miner in eastern Pennsylvania for twelve-and-one-half years, leaving the mines permanently in 1954. On October 17, 1973, Echo applied the Department of Labor for black lung disability benefits under the Black Lung Benefits Act (Act), 30 U.S.C. Sec. 901 et seq. (1982). His claim was denied at every administrative level. Following the final decision of the Benefits Review Board (Board), Echo petitioned this Court for review.
 
 
 2
 The issue before us is whether Echo's post-mine employment, as a receiving clerk in a shirt factory, constitutes comparable and gainful employment sufficient to rebut the interim presumption of black lung disability. The Administrative Law Judge (ALJ) and the Board held that Echo's employment was comparable and gainful, and denied his request for benefits. For reasons discussed herein, the decision of the Board will be vacated and the case remanded for further consideration.
 
 I.
 
 3
 Joseph Echo is sixty-one years old and has lived in the anthracite coal region of eastern Pennsylvania his entire life. During his youth and early adulthood, Echo spent twelve-and-one-half years working as a general laborer in various underground mines. His duties included shoveling coal, pushing loaded coal buggies out of the mines, and carrying and erecting wooden supports in the mine tunnels.
 
 
 4
 In 1954, Echo left the mines taking a job with the Wide Awake Shirt Company in Mahanoy City, Pennsylvania. The ALJ found that Wide Awake has continuously employed Echo as a piece-goods inspector since 1954. In his job, Echo keeps a record of the incoming and outgoing shipments and "occasionally" is required "to lift and carry small bundles." App. at 135a; see also App. at 104a-05a.
 
 
 5
 Early in 1970, Echo began to develop symptoms of pneumoconiosis, such as a cough, shortness of breath, and loss of energy. App. at 71a-72a. After Echo was diagnosed as suffering from pneumoconiosis, he applied to the Department of Labor for disability benefits pursuant to the Act, 30 U.S.C. Sec. 901 et seq. His claim was denied, first by the Department's Office of Workers' Compensation Programs, and later by an ALJ. The ALJ determined that although Echo had successfully established an interim presumption of disability pursuant to 20 C.F.R. Sec. 727.203(a) (1984), the government had rebutted the presumption of disability by demonstrating that Echo's job in the shirt factory was both "gainful" and "comparable to the work he performed in the mines ..." App. at 136a-37a, citing 20 C.F.R. Sec. 727.203(b)(1) (1984).[1]
 
 
 6
 Echo appealed the denial of benefits to the Board, which affirmed the decision of the ALJ. Having exhausted his administrative remedies, Echo now seeks review in this Court pursuant to 33 U.S.C. Sec. 921(c) (1982).
 
 II.
 
 7
 The Act has its origins in the Federal Coal Mine Health and Safety Act of 1969, Pub.L. No. 91-173, 83 Stat. 742 (1969). The original legislation was intended to remedy a number of safety problems endemic to coal mining, then considered "the most hazardous occupation in the United States," H.R.Rep. No. 563, 91st Cong., 1st Sess. 1, reprinted in 1969 U.S.Code Cong. & Ad.News 2503, 2503. It established health and safety standards, and mandated regular inspections and investigations of the mines. By these precautionary measures, Congress sought to minimize the risk of all-too-frequent mining accidents. There was a further work hazard, however, for which inspections could offer little protection: pneumoconiosis, commonly known as black lung disease. Accordingly, Congress sought to provide what relief it could in the form of disability payments to those miners who were "totally disabled" as a result of black lung disease. 30 U.S.C. Sec. 901.
 
 
 8
 "Total disability," as used in the 1969 legislation, is a term of art. In the original legislation, its precise definition was left to the Secretary of Health, Education and Welfare. Federal Coal Mine Health and Safety Act, P.L. 91-173, Sec. 402(f), 83 Stat. 742, 793 (1969).[2] In 1972, however, the statute was amended, and Congress gave "total disability" a more exact and expansive definition. Under the amended act, an applicant is considered totally disabled:
 
 
 9
 when pneumoconiosis prevents him from engaging in gainful employment requiring the skills and abilities comparable to those of any employment in a mine or mines in which he or she previously engaged with some regularity and over a substantial period of time.
 
 
 10
 30 U.S.C. Sec. 902(f)(1)(A) (1972).
 
 
 11
 The purpose of the 1972 amendment is clear: Congress was displeased with the Secretary's stringent application of the legislation. The Secretary had adopted a test which resulted in the denial of black lung benefits whenever a miner had any job whatsoever. S.Rep. No. 743, 92nd Cong., 2d Sess. 16-17, reprinted in 1972 U.S.Code Cong. & Ad.News 2305, 2320-21. The Senate Report criticized the unacceptably high rate of denials nationwide, finding that the Act, as administered, did "not in fact benefit countless miners and their survivors who were the intended beneficiaries of the Black Lung Program." Id. at 3; 1972 U.S.Code Cong. & Ad.News at 2307;[3] see also H.R.Rep. No. 151, 95th Cong., 2d Sess. 4, reprinted in 1978 U.S.Code Cong. & Ad.News 237, 240 (1972 amendments enacted "in large part because of dissatisfaction with the administration of the law by the Department of Health, Education, and Welfare ... which in some respects, clearly contravened discernible legislative guidelines.")
 
 
 12
 In 1978 the Act again was amended to liberalize treatment of miners' disability claims. The amended statute explicitly provides that continued employment in a mine should not, by itself, bar a claim for benefits. 30 U.S.C. Sec. 902(f)(1)(B) (1982). The House Report noted that while this understanding was implicit in the original statute, the amendment was necessary because, through "administrative misapplication," "claims have continuously been denied solely on the basis that the miner is or was working in a mine with no consideration as to the type of work being performed." H.R.Rep. No. 151, 95th Cong., 2d Sess. 11, reprinted in 1978 U.S.Code Cong. & Ad.News 237, 247.
 
 
 13
 The legislative history of the Black Lung Program demonstrates a clear pattern. Congress passed a statute intended to provide wide-spread benefits to miners disabled by black lung disease. The benefits, while never very high,[4] were intended to be liberally awarded. Administrative practice, however, did not comport with legislative intent, and twice Congress was impelled to specify its intentions more clearly, "in order to insure as broad coverage as possible." S.Rep. No. 743, 92nd Cong., 2d Sess. 17, reprinted in 1972 U.S.Code Cong. & Ad.News at 2321; see generally, Note, The Black Lung Benefits Reform and Revenue Acts of 1977, 80 W.Va.L.Rev. 539 (1978).
 
 III.
 
 14
 It is against this background that we review Echo's appeal. His complaint suggests that despite repeated Congressional action, the pattern of unduly strict administration of benefits may be continuing. The ALJ deemed Echo's employment as a receiving clerk to be sufficiently "gainful and comparable" to his mining work to rebut the presumption of total disability. App. at 135a. This determination was based on the 26-year duration of Echo's full-time employment at Wide Awake, as well as the educational requirements and location of the job. Id. at 136a.
 
 
 15
 The ALJ declared that "the record clearly shows that the coal mining job was the more strenuous occupation," but determined that as long as Echo's present job was "not sedentary," it was comparable.[5] Id. Such a conclusion appears strikingly similar to the administrative positions that Congress found unacceptable when it amended the Act in 1972 and 1978. The thrust of the ALJ's decision suggests that any employment not confined to a desk or bed will support a denial of benefits. We cannot agree that such a conclusion is consonant with the legislation.
 
 
 16
 More importantly, the ALJ never considered the relative earnings of Echo's two jobs. As a receiving clerk, Echo earned $4.90 per hour in 1980. App. at 37a. The average hourly wage of a coal miner in 1980 was $10.86. U.S. Bureau of the Census, Statistical Abstract of the United States: 1984, (104th ed.) at 717. Thus, Echo's current job is both considerably less strenuous and less lucrative than his work in the coal mine. A "comparability" analysis that ignores the relative compensations of the applicant's past and present jobs would appear to be only a step away from a flat rule that any employment will serve to deny benefits. In the context of a miner who continues to work in the mining industry, Congress has explicitly stated that such continued employment cannot serve as a flat bar to benefits. 30 U.S.C. Sec. 902(f)(1)(B) (1982). There would seem to be no reason why that admonition should not apply equally to those who are forced to leave mining altogether and to take less strenuous and less remunerative employment.
 
 
 17
 Even before the 1978 amendments, a number of courts had refused to allow the mere fact of employment to rebut a presumption of total disability. See, e.g., Collins v. Mathews, 547 F.2d 795 (4th Cir.1976); Felthager v. Weinberger, 529 F.2d 130 (10th Cir.1976); Lincovich v. Secretary of Health, Education & Welfare, 403 F.Supp. 1307 (E.D.Pa.1975). In each of these cases, the reviewing court vacated ALJ decisions that had denied benefits simply because the applicant was employed. They held that where employment was sporadic or earnings marginal, benefits should not be denied. In Collins, the applicant had continued to work in the mines after contracting black lung disease, largely because he had a family to support and no other skills. Because of his illness, however, he could work only one-third of the time, and was capable only of "lighter tasks." Collins, 547 F.2d at 797. The ALJ in that case relied on the applicant's earnings record, which showed a relatively consistent income level over the last nine-and-one-half years of his life. The Fourth Circuit rejected the ALJ's conclusion, noting that the claimant's "consistent" income level in fact reflected a decrease in his real wage rate. Collins, 547 F.2d at 799. Where disability causes a miner's or ex-miner's wages to fall in comparison to what he would have been earning if still employed in his previous mining position, it is unlikely that his employment is "comparable" in the sense that Congress intended that term.
 
 
 18
 Congress effectively ratified the approach taken by these courts when it amended the Act in 1978, to provide that continued employment in a mine should not in and of itself rebut the total disability presumption. In fact, Congress went further than the courts, setting out the following three-part test in the legislative history:
 
 
 19
 the section isolates specific situations of employment change which may suggest the existence of legal disability notwithstanding continued employment status. The section thus bars denial of a claim for benefits payments solely on the basis of employment as a miner if (1) the location of such employment was recently (from the perspective of the date of filing, or death, as the case may be) changed to a mine area having a lower concentration of dust particles, (2) the nature of such employment was changed so as to involve less rigorous work, or (3) the nature of such employment was changed so as to result in the receipt of substantially less pay.
 
 
 20
 H.R.Rep. No. 131, 95th Cong., 2d Sess. 11, reprinted in 1978 U.S.Code Cong. & Ad.News 237, 247. (emphasis supplied) The test is framed in the disjunctive; if any one of the three provisions applies, employment is not "comparable," and the applicant is entitled to benefits. While the 1978 Amendment specifically addressed only those who continued to work in mining, we believe that the spirit of the Act suggests a similar standard for those who have left mining.
 
 
 21
 Relevant factors in considering comparability of present employment include relative compensation, working conditions, levels of exertion, educational requirements, location of employment, and skills and abilities required. See 20 C.F.R. Secs. 410.412(a)(1) (1983); see also Padavich v. Mathews, 561 F.2d 142, 146 (8th Cir.1977); Miniard v. Califano, 618 F.2d 405, 409 (6th Cir.1980).
 
 
 22
 We consider compensation to be the prime criterion of comparability; the other factors enumerated in the case law, legislative history, and regulations are generally (though concededly imperfectly) reflected in the level of compensation. Compensation, moreover, provides an objective standard, less subject to the vagaries of individual administrative law judges. We reiterate what Congress has said: the fact that an applicant is employed does not in and of itself rebut the presumption. Moreover, the fact that an applicant's current earnings are less than those of his fellow workers in the mines provides strong evidence that his present work is not "comparable." In such cases, if the Secretary can show by clear and convincing evidence that, wholly unrelated to disability, the applicant voluntarily chose to forego a higher-paying mine job for a lower-paying job, or for no job at all, the presumption could be rebutted. On the other hand, if the Secretary cannot satisfy this burden, benefits should be awarded accordingly.[6]
 
 IV.
 
 23
 Since the ALJ and the Benefits Review Board did not review Echo's claim with these considerations in mind, we vacate the judgment and remand the matter so that such a review may now be conducted.
 
 
 
 *
 Honorable Thomas N. O'Neill, Jr., United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 20 C.F.R. Sec. 727.203 states in pertinent part:
 (b) Rebuttal of interim presumption. In adjudicating a claim under this subpart, all relevant medical evidence shall be considered. The presumption in paragraph (a) of this section shall be rebutted if:
 (1) The evidence establishes that the individual is, in fact, doing his usual coal mine work or comparable and gainful work (see Sec. 410.412(a)(1) of this title); ....
 
 
 [2]
 In the section-by-section analysis of the Conference Report on the 1969 legislation, the following appears:
 The parameters of the term "total disability" will be established from time-to-time by the Secretary of Health, Education, and Welfare, but he must not establish more restrictive criteria for determining disability than the criteria applicable under section 223(d) of the Social Security Act, as amended, for purposes of disability under the Act. It is expected that initially this criteria will be followed. As time goes on, the Secretary may develop more liberal criteria consistent with the purpose of this title.
 Quoted in S.Rep. No. 743, 92nd Cong., 2d Sess. 17, reprinted in 1972 U.S.Code Cong. & Ad.News 2305, 2321.
 
 
 [3]
 Borrowing from Emile Zola, the Senate Report dramatically demonstrated its concern with the administrative denial of black lung claims:
 Over a hundred years ago, Emile Zola wrote his non-medical description of the coal miner in Germinal:
 Have you been working long at the mine?
 He flung open both arms.
 Long? I should think so. I was eight when I went down and I am fifty-eight. They tell me to rest, but I'm not going to; I'm not such a fool. I can get on for two years longer, to my sixtieth, so as to get the pension.
 A spasm of coughing interrupted him again.
 I never used to cough; now I can't get rid of it. And the queer thing is that I spit.
 The rasping was again heard in [his] throat, followed by a black expectoration.
 Is it blood?
 He slowly wiped his mouth with the back of his hand.
 No, it's coal. I've got enough in my carcass to warm me till I die. And it's five years since I put a foot down below. I stored it up, it seems, without knowing it.
 Suffice it to say that this miner's widow, were she alive today, would have great difficulty in obtaining benefits.
 The reality of this projection has been borne out by the rate of denials to black lung claimants and their widows. In some states as many as 70 percent of the applicants have been turned down. The national average is a 50 percent denial rate.
 Id. at 9; 1972 U.S.Code Cong. & Ad.News at 2313.
 
 
 [4]
 The ceiling as of 1984 for yearly benefits is approximately $3,800. See 30 U.S.C. Sec. 922(a)(1) (1982)
 
 
 [5]
 The ALJ also found Echo's work to be "gainful." "Gainful" is not defined in the Black Lung statute or regulations, but the Secretary takes the position that "as long as he is able to earn money ... that is gainful." Transcript of oral argument at 20. If so, "gainful" is a de minimus threshold provision. Whatever "gainful" means, however, we find the level of compensation to be subsumed in the comparability requirement. Whether or not work is gainful, therefore, does not answer the question: Congress has insisted that the work must also be comparable
 
 
 [6]
 We focus on relative wages not to suggest that the Black Lung Program is a workers' compensation program, but rather because of the objective manageability and comprehensive character of compensation as an indicium of comparability. Thus, compensation need not be the endpoint of the inquiry; rather we suggest it as a starting point, one which will often obviate the need for further subjective inquiry. The other factors listed above, i.e., relative exertional levels, working conditions, educational requirements, location of employment, and skills and abilities required, are also important to consider. But where compensation is manifestly unequal, comparability is unlikely to be found