**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Petitioner,**

v.

**CONSOLIDATION COAL COMPANY and William Petracca, Respondents.**

**No. 88–3667.**

United States Court of Appeals, Sixth Circuit.

Argued March 27, 1989.

Decided Sept. 8, 1989.

Sylvia T. Kaser (argued), U.S. Dept. of Labor, Office of the Sol., Washington, D.C., for Director, OWCP, U.S. Dept. of Labor, petitioner.

Douglas A. Smoot (argued), Jackson & Kelly, Charleston, W.Va., for Consolidation Coal Co., respondent.

Geary M. Battistelli, Beneke, Battistelli & Bremer, Wheeling, W.Va., for William Petracca, respondent.

Before ENGEL, Chief Judge, BOGGS, Circuit Judge, and COHN, District Judge.*

COHN, District Judge.

This is an appeal under the Black Lung Benefits Act (the Act), 30 U.S.C. §§ 901–945 (Title IV of the Coal Mine Health and Safety Act of 1969, 30 U.S.C. §§ 801–960). Appellee, William Petracca, contracted coal miner's pneumoconiosis (black lung) after working for 34 years at mines operated by appellee Consolidation Coal Company (Consolidation). The Act provides that the Black Lung Disability Trust Fund, administered by the Director of Workers' Compensation Programs (Director) of the U.S. Department of Labor, shall be responsible for the payment of benefits to any black lung claimant who ceased working as a statutorily defined "coal miner" before December 31, 1969, the effective date of the Act. The individual coal mine operators are responsible for any black lung claims filed by miners who worked for them after that date. On April 17, 1980, Petracca was found to be disabled by pneumoconiosis and eligible for benefits.

Consolidation claims that it was not a "responsible operator" under the Act because Petracca had worked in the Company's machine repair shop for the last twenty-five years and was thus not a "coal miner" after December 31, 1969. The Benefits Review Board (Board) agreed and dismissed Consolidation as the responsible operator, holding the Trust Fund liable for Petracca's benefits. The Director appeals on the grounds that the machine repair shop in which Petracca worked was "in or around a coal mine" and he should thus be found to have worked as a "miner" after December 31, 1969. The Court agrees with the Director and the decision of the Benefits Review Board will be reversed and

Consolidation reinstated as the responsible operator.

I.

Petracca was born in 1910. He began working for Consolidation in 1929 as a loader, continuing on and off there until 1938. Between 1942 and 1948, Petracca worked for the Wheeling Township Coal Co. as a belt operator. He returned to Consolidation in 1948 and began working in the central machine shop. He worked in the shop, first as a painter, then as a laborer and finally as a mechanic until his retirement in 1976.

On February 2, 1979, Petracca filed a claim for black lung benefits. The Office of Workers' Compensation Programs notified Consolidation on April 17, 1980 that it had made an initial finding that Petracca was entitled to benefits and that Consolidation was found to be the responsible operator. Consolidation timely contested the finding on the grounds, *inter alia*, that Petracca was not a "miner" under the Act and that he was not disabled due to pneumoconiosis. An administrative hearing was held on March 14, 1984, where medical evidence was presented concerning Petracca's physical condition and his employment history. On March 29, 1985, the ALJ issued a formal decision and order holding that Petracca was entitled to benefits and that Consolidation was the responsible operator under the Act. Consolidation appealed the ALJ's ruling to the Board. On February 24, 1988, the Board issued a decision upholding the ALJ's finding that Petracca was totally disabled but dismissing Consolidation as the responsible operator. The Board held that Petracca's work in Consolidation's machine shop was not coal mine employment under the Act and that the Trust Fund was thus liable for Petracca's benefits. On April 19, 1988, the Director filed a timely appeal to this Court on the issue of Consolidation's liability for Petracca's benefits.[1]

* The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. Consolidation has not challenged the Board's determination as to Petracca's disability. Accordingly, the issue of Petracca's entitlement to benefits is taken as established for the purposes of this appeal.

## II.

### A.

 Our review of a decision of the Board is limited to assuring that the correct statutory standards have been applied and that no errors of law have been made. *Warman v. Pittsburgh & Midway Coal Mining Co.*, 839 F.2d 257, 258 (6th Cir. 1988), *quoting Gibas v. Saginaw Mining Co.*, 748 F.2d 1112, 1116 (6th Cir.1984), *cert. denied*, 471 U.S. 1116, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). The Board must accept the ALJ's findings of fact if they are supported by substantial evidence in the record considered as a whole. 33 U.S.C. § 921(c)(3), as incorporated by 30 U.S.C. § 932(a). Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as sufficient to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). The Board may not engage in a *de novo* review, 20 C.F.R. § 802.301, or substitute its own factual findings because it believes them to be more reasonable than those reached by the ALJ. *Moseley v. Peabody Coal Co.*, 769 F.2d 357, 360 (6th Cir.1985). On questions of law, however, both this Court and the Board have plenary authority to review the conclusions of the ALJ and reverse them if convinced that they are erroneous. *Warman, supra.*

### B.

The issue here is whether the Black Lung Disability Trust Fund or Consolidation is liable for Petracca's benefits.[2] Coal mine operators are not required to pay black lung benefits to a miner who was not employed in or around a coal mine for at least one day after December 31, 1969. 30 U.S.C. § 932(c); 20 C.F.R. § 725.492(a)(3). The term "miner" is defined in the Act as "... any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal." 30 U.S.C. § 902(d); 20 C.F.R. §§ 725.101(a)(26) and 725.202(a). A "coal mine" is an

> area of land and all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real or personal, placed upon, under, or above the surface of such land by any person, used in, to be used in, or resulting from, the work of extracting in such area bituminous coal, lignite, anthracite, from its natural deposits in the earth by any means or method, and the work of preparing the coal so extracted, and includes custom coal preparation facilities.

30 U.S.C. § 802(h)(2); 20 C.F.R. § 725.101(23). Coal preparation is defined as "the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of a coal mine." 30 U.S.C. § 802(i); 20 C.F.R. § 725.101(a)(25).

 Several courts of appeal, including this court, have interpreted the statutory definition of "coal miner" in section 902(d) as involving two separate components. First, the individual must have worked "in or around a coal mine" (situs requirement) and, second, that work must have been in the "extraction or preparation of coal" (function requirement). *See e.g. Mitchell v. Director, Office of Workers' Compensation Programs*, 855 F.2d 485, 489 (7th Cir. 1988); *Foreman v. Director, Office of*

---

**2.** The Coal Mine Health and Safety Act of 1969 provided that the federal government would be financially responsible for the payment of benefits to miners filing black lung claims prior to December 31, 1973. Thereafter, the individual coal mine operators were to be directly liable for the payment of benefits to disabled claimants who had worked for them as miners after December 31, 1969. *See* 30 U.S.C. § 932(a); 20 C.F.R. § 725.492(a). The 1977 Amendments to the Black Lung Act (Title IV of the Coal Mine Health and Safety Act), Pub.L. 95–227, 92 Stat. 11 (1978), established the Black Lung Disability Trust Fund, financed by an excise tax on coal sold after March 31, 1978. The Trust Fund pays benefits to disabled miners who ceased coal mine employment prior to January 1, 1970 or who contracted pneumoconiosis working for an operator which is no longer in business. *See generally* E. Gellhorn, *The "Black Lung" Act: An Analysis of the Legal Issues Raised Under the Benefit Program Created by the Federal Coal Mine Health and Safety Act of 1969 (As Amended)*, 7–9 (Federal Judicial Center, 1981).

*Workers' Compensation Programs,* 794 F.2d 569, 570 (11th Cir.1986); *Wisor v. Director, Office of Workers' Compensation Programs,* 748 F.2d 176, 178 (3d Cir. 1984); *Southard v. Director, Office of Workers' Compensation Programs,* 732 F.2d 66, 69 (6th Cir.1984); *Amigo Smokeless Coal Co. v. Director, Office of Workers' Compensation Programs,* 642 F.2d 68, 70 (4th Cir.1981). What we must do is determine whether the ALJ was correct in holding that Petracca's work in the central machine shop satisfied both components of this two part test.

## III.

### A.

The ALJ held that Petracca's work in the central machine shop between 1970 and 1976 satisfied both the situs and function prongs of the coal mine employment test. As to function, the ALJ found that because "coal cannot be extracted without properly functioning equipment[,]" Petracca's duties were an "integral part of the coal extraction and preparation process." Decision and Order at 6, *quoting Skipper v. Mathews,* 448 F.Supp. 300, 302 (M.D.Pa.1977). As to situs, he found that the repair shop itself was a "structure or facility used in the process of extracting coal," and thus within the statutory definition of "coal mine." Decision and Order at 4. Since it was conceded that Petracca worked in the shop after December 31, 1969, questions of distance were rendered irrelevant. *Id.* The ALJ noted the apparent conflict between his ruling and the Board's decision in *Siebert v. Consolidation Coal Co.,* 7 Black Lung Rep. 1–42 (1984), which held that a coal mine's central repair shop located a mile from the nearest extraction site did not constitute coal mine employment because it failed to meet the situs requirement. The ALJ distinguished *Siebert* on the grounds that "while somewhat ambiguous, [the testimony] generally indicated that after Claimant began working in the machine shop, he was required to work occasionally in the strip mine pits 'on and off' until the time he retired[.]" Decision and Order at 5. He held that the evidence,

while "inconsistent and unclear," was insufficient to rebut the regulatory presumption that an individual employed by a coal mine operator was a statutorily defined "miner." *See* 20 C.F.R. § 725.202(a).

The Board rejected the ALJ's findings as to situs, on the grounds that he improperly shifted the burden of proof on the question of coal mine employment. The Board held that, in fact, it is the claimant's burden to establish years of coal mine employment. Board Decision and Order at 2. The Board also held that work in a mine's central machine shop was not coal mine employment under the Act, *citing Siebert, supra,* and thus dismissed Consolidation as the responsible operator.

### B.

The Director offers two alternative theories under which Petracca's work in the central machine shop should be considered coal mine employment under the Act. First, he claims that the machine shop itself constitutes a statutorily defined "coal mine." Relying on the reasoning of *Skipper, supra,* the Director argues that since the repairs performed in the machine shop are essential to the mine's extraction activities, the shop should be considered a facility on an area of land used in the work of extracting coal. *See* 30 U.S.C. § 802(h)(2). He claims that the perimeter of the coal mining area is to be defined by function, not by strict geographical lines. Alternatively, the Director argues that even if the machine shop is not considered a section 802(h)(2) coal mine, Petracca should still be considered a miner because he worked "around" a statutorily defined coal mine. He noted that section 2(b) of the 1977 amendments to the Black Lung Act, Pub.L. 95–239, 92 Stat. 95 (codified as amended at 30 U.S.C. § 902(d)), expanded the definition of miner from "any individual who is or was employed in a coal mine" to "any individual who works or has worked in *or around* a coal mine or coal preparation facility in the extraction, preparation, or transportation of coal." [emphasis added]. The Director says that the area "around" the coal mine should extend to an overall

extraction area on which functions integral to extraction are performed, and that strictly geographical tests should be eschewed.

Consolidation, in turn, argues that the Director's proposed test would completely write the situs requirement out of the statute and would render function the sole factor determinative of coal mine employment. It contends that under such a construction all employees of a coal mine operator would necessarily be considered coal miners, regardless of where they work. Such an interpretation, Consolidation argues, would be antithetical to the statutory language and Congressional intent. It suggests that the line should be drawn at distant facilities removed from the mining process, where the employees never go to the actual mine site. Consolidation draws additional support for its position from a factually similar Seventh Circuit case in which the court held that an electrician working in a repair shop more than a mile and a half from the nearest mine was not a "coal miner" within the meaning of the Act because he failed to meet the situs requirement. *See Director, Office of Workers' Compensation Programs v. Ziegler Coal Co.*, 853 F.2d 529 (7th Cir.1988).

### IV.

■ The position of the Director that the central machine shop is itself a "coal mine" under the Act has some facial appeal, but upon closer examination proves inconsistent with the statutory language. As noted earlier, the statutory definition of "coal mine" is written in broad, sweeping language. It reads in relevant part:

'[C]oal mine' means an area of land and all structures, facilities, machinery, tools, equipment, shafts, slopes, tunnels, excavations, and other property, real and personal, placed upon, under, or above the surface of such land, by any person, used in, to be used in, or resulting from, the work of extracting in such area bituminous coal, lignite, or anthracite from its natural deposits in the earth by any means or method, and the work of preparing the coal so extracted, and includes custom coal preparation facilities.

30 U.S.C. § 802(h)(2). Certainly, such a definition would seem to encompass a machine shop located three-quarters of a mile from active strip mines.

This was the position taken by the district court in *Skipper, supra,* where a repair shop located a mile and a half from the extraction site was held to be a coal mine under the Act. The district court found that because the activities of the shop were integrally related to the work of extracting coal, the shop itself fell within the statutory definition of coal mine. The court went on to state that a facility involved in the extraction of coal need not be in the immediate vicinity of the actual extraction site to be considered part of a coal mine. *Id.* at 302–03. The district court was untroubled by the fact that in order to be considered a coal mine, the above ground structure must be used in the extraction of coal "in such area," explaining that

[t]he legislative history of § 802 indicates that it was intended to be a broad definition covering 'all coal mines whether underground or not' and 'areas of adjoining mines physically underground.' *See* 2 U.S.Code Cong. and Admin.News, p. 2503 (1969).

*Id.* at 302–03.

This same question was recently considered by the Seventh Circuit in *Ziegler, supra.* In that case, the court rejected the Director's argument that the repair shop was a coal mine under section 802(h)(2), stating that "the statutory definition of a coal mine ... contains a geographical component; the facility must be on or below the area of land where coal is naturally found and is being extracted." *Id.* at 533.

We are constrained to agree with the Seventh Circuit that section 802(h)(2) does impose a geographical limitation on whether a facility used in the extraction of coal can be considered a coal mine. A close examination of the language of the section shows this to be the only reasonable interpretation. Section 802(h)(2) distinguishes between "structures, facilities, machinery, tools, equipment, shafts, slopes, excavations, and other property" which are used in the extraction of coal and those which

are used in the preparation of coal. A structure or facility used in the extraction of coal is defined as a coal mine only if it is used in the extraction of coal "in such area." However, no such modifying clause applies to facilities used in the preparation of coal. The clear implication of this language is that in order for an extraction facility to be considered a coal mine, it must be located "in such area" where the coal is actually extracted. Conversely, preparation facilities are still defined as "coal mines" even though they may be geographically remote from the site where coal is physically mined. While it is unclear exactly how far Congress intended the limitation "in such area" to extend, we must reject the Director's argument that a machine shop performing a covered function is *per se* a coal mine under the Act.

### V.

Even if the machine shop is not itself a coal mine, however, it is still possible to find that Petracca falls within the definition of miner under the Act. As noted earlier, a miner is defined as "any individual who works or has worked in *or around* a coal mine or coal preparation facility in the extraction, preparation, or transportation of coal." 30 U.S.C. § 902(d). [emphasis added]. The term "around" is not self defining. Congress apparently left the exact limits of the area encompassed by the term intentionally vague. In light of this gap, we have an obligation to articulate some standard to determine whether on-site facilities physically removed from the extraction site are located "around a coal mine." In attempting to do so, we keep in mind that the Director's statutory interpretation is entitled to judicial deference since he is the one charged with administration of the Act. *Saginaw Mining Company v. Mazzulli*, 818 F.2d 1278 (6th Cir.1987).

### A.

■ Recently, the Seventh and the Eleventh Circuits have each considered this question. In *Ziegler, supra,* the Seventh Circuit took a restrictive view, holding that employees working in facilities technically adjacent to the actual extraction site could be considered miners working "around" a mine only "if their normal duties brought them into frequent contact with the extraction site and the accompanying dust exposure." *Id.* at 535. The court noted that this would be an intensively fact-dependent determination and cautioned against the adoption of an inflexible, fixed distance rule. *Id.* In *Baker v. United States Steel Corp.*, 867 F.2d 1297 (11th Cir.1989), the Eleventh Circuit found that a machine shop no closer than half a mile from the extraction pits was within the area around the mine. The court distinguished *Ziegler*, noting that the issue there was not whether the claimant would receive benefits, but rather whether the operator or the Trust Fund was to pay benefits which had already been approved. It held that the determination of whether a claimant satisfied the situs requirement "is necessarily dependent on the circumstances of each individual claim." *Id.* at 1300. The court identified two factors that it found particularly significant. First, it noted that where a machine shop is situated in a central location for the efficiency and economy of the employer, it will ordinarily be held to be "around" the coal mine. Second, the court suggested that prolonged exposure to coal dust was probative of a claimant's having met the situs requirement. *Id.*

### B.

Having considered both *Ziegler* and *Baker*, we find that the Eleventh Circuit's approach is more faithful to the language of the Act and the policy considerations upon which it is based. The *Ziegler* test for determining when an employee is a miner is unsatisfactory because it completely reads the 1977 amendment to the definition of the term "miner" out of the Act.[3] *See* section III(B), *supra.* An examination of the legislative history of the 1977 amend-

---

3. Professor James Willard Hurst has cautioned against interpreting an amended statute in a manner which would rob the amending language of its "distinctive force." *See* J. Hurst, *Dealing with Statutes* 61 (1982).

ments shows that Congress deliberately sought to *expand* the coverage of the Act and include miners who were not formerly within its protection. Further, even the pre–1977 cases construing the term "miner" held that claimants having "frequent contact with the extraction site and the accompanying dust exposure" were covered. In *Adelsberger v. Mathews*, 543 F.2d 82 (7th Cir.1976), the court held that a clerical employee whose duties frequently required her to go into the defined area of the mine and underneath the tipple to talk to miners was herself a miner under section 902(d). Similarly, in *Roberts v. Weinberger*, 527 F.2d 600 (4th Cir.1975), the court held that the deceased husband of a claimant who drove a truck hauling coal from the immediate extraction site to a nearby tipple was a miner under section 902(d). These cases demonstrate that even when "miner" was defined as "any individual who is or was employed in a coal mine," claimants having frequent contact with the extraction site were held to be covered.

The legislative history of the Act also suggests that the broader approach of the Eleventh Circuit is more in line with Congressional intent. The 1977 amendments to the Act expanded the definition of miner from "any individual who is or was employed in a coal mine" to "any individual who works or has worked in *or around* a coal mine or coal preparation facility in the extraction, preparation, or transportation of coal." *See* Black Lung Benefits Reform Act of 1977, Pub.L. 95–239, 92 Stat. 95 (codified as amended at 30 U.S.C. § 902(d)). The introduction to Senate Report 95–209, accompanying S. 1538 states:

The broad purposes of the bill reported by the Committee on Human Resources are to remove certain eligibility restrictions for the victims of Black Lung disease and their survivors who should be entitled to benefits; to reaffirm the legislative intent with respect to certain provisions which have been legislatively misinterpreted; and to assure that coal mine operators assume full financial responsibility for the Black Lung Benefits program.

\* \* \* \* \* \*

Based on evidence presented to the Committee, it is apparent that there are many denied claims that should have been allowed under the 1972 amendments to Title IV of the Federal Coal Mine Health and Safety Act of 1969.

The provisions of the Committee bill will do much to eliminate the very real difficulties encountered by thousands of old and sick miners and their widows in their efforts to obtain what they believe are their well deserved benefits.

S.Rep. 95–209, at 1. Describing the revision of section 902(d), the report states that "the term 'miner' is *expanded* to include workers *around a coal mine*, processors and transporters of coal, and coal mine construction workers." S.Rep. 95–209 at 2 [emphasis added].[4]

This court has previously held that purposes and history of the Act require a broad interpretation. In *United States v. Consolidation Coal Co.*, 560 F.2d 214 (6th Cir.1977), *vacated and remanded*, 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978), *opinion reinstated*, 579 F.2d 1011 (6th Cir. 1978), the Court held that coal mine offices located close to working mines and which were instrumental to ongoing mining operations fell within the definition of coal mine

---

**4.** Describing the successive amendments to the Act since 1969, Professor Ernest Gellhorn has noted that

[w]ith each change in coverage of the program [it] was extended so that eliglbility claims for compensation were more readily established. For example, the original Act provided coverage only for underground miners. This definition excluded many workers disabled because of pneumoconiosis because of exposure to similar dust levels in other mining operations. The effect of this limitation was spelled out in studies and congres-

sional hearings and support for an expansion of the Act was mobilized. One result was that in 1972 the number of workers covered by the Act was expanded to include all coal miners, not just those working in underground mines. Finally, in 1977 the Act's eligibility provisions were rewritten to cover persons who work "in or around" a coal mine in the extraction or preparation of coal, thus including coal mine construction workers and truckers transporting coal.

E. Gellhorn, *supra*, at 4–5.

under the Act. We noted that " '[s]ince the Act in question is a remedial safety statute, with its primary concern being the preservation of human life, it is the type of enactment as to which a "narrow or limited construction is to be eschewed." ' " *Id.* at 218 *quoting Freeman Coal Mining Co. v. Interior Board of Mine Operations Appeals*, 504 F.2d 741, 744 (7th Cir.1974). Similarly, in deciding on the appropriate construction of the term "criteria" in 30 U.S.C. § 902(f)(2), this Court in *Kyle v. Director, Office of Workers' Compensation Programs*, 819 F.2d 139 (6th Cir.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 566, 102 L.Ed.2d 591 (1988), observed that:

> The legislative history of the Black Lung Program demonstrates a clear pattern. Congress passed a statute intended to provide wide-spread benefits to miners disabled by black lung disease. The benefits, while never very high, were intended to be liberally awarded. Administrative practice, however, did not comport with legislative intent, and twice Congress was impelled to specify its intentions more clearly 'in order to insure as broad coverage as possible.'

*Id.* at 143, *quoting Echo v. Director, Office of Workers' Compensation Programs*, 744 F.2d 327, 330 (3d Cir.1984). Most recently, in *Falcon Coal Co. v. Clemons*, 873 F.2d 916, 922 (6th Cir.1989), we noted that "[a]lthough 'the statutory language itself is restrictive,' *Wisor v. Director OWCP*, 748 F.2d 176, 178 (3d Cir.1984), remedial legislation, such as the Black Lung Benefits Act, should be construed broadly." [cites omitted].

### C.

In light of the above discussion, it is clear to us that the term "around a coal mine" must be given a broad interpretation. Constructions which lead to seemingly arbitrary distinctions between similarly situated employees are to be avoided. While it is difficult to develop a verbal formula which will yield a consistent and fair result in each case, we nonetheless believe that the Eleventh Circuit's functional approach, as reflected in *Baker, supra,* represents a means of escaping from the indeterminacy of the situs dilemma.

The distance of the repair facility from the extraction site in the reported machine shop cases has varied from between half a mile to one and a half miles. *See e.g. Baker, supra* (half a mile); *Ziegler, supra* (one and a half miles); *Consolidation Coal Co. v. Graham*, 725 F.2d 674 (4th Cir.1983) (one and a half miles); *Skipper, supra* at 302 ("not in the immediate area"); *Siebert, supra* (one mile); *Consolidation Coal Co. v. Director, OWCP*, No. 85–1655 (Ben. Rev.Bd. Feb. 24, 1988) (three quarters of a mile). Yet the holdings in these cases seem to vary unpredictably. *See e.g. Baker, supra* (half mile held around the coal mine); *Ziegler, supra* (mile and a half held not around the coal mine); *Consolidation Coal Co. v. Graham, supra* (mile and a half held around the coal mine); *Skipper, supra* (not in immediate area held around the coal mine); *Siebert, supra* (one mile held not around the coal mine); *Consolidation Coal Co. v. Director, OWCP, supra* (three quarters of a mile held not around the coal mine). We cannot help but be struck by the apparent arbitrariness in the outcomes of cases which we believe are factually indistinguishable. All of these cases involve on-site mine equipment repair shops where machinery covered with coal dust is brought in for repair and painting. Clearly it is economically efficient for the mine operator to maintain repair shops in close proximity to the extraction pits in order to minimize the costs of transporting broken-down equipment, to reduce the turnaround time for repairs, and to assure availability of a staff of mechanics who can be called to the pits on short notice. It is equally clear, however, that mining operations are inherently peripatetic. When closer pits are exhausted, operations move to virgin sites. As one repair shop employee testified in this case,

> [t]hat's the way stripping goes. You're at this hill one day, and the next day, you're over across the road. You go for the easy stuff first and then when they get bigger shovels, they take them back and get them. Some of them they stripped maybe in '45 and some of them

they brought back like a year or two ago and took the bigger banks.

Joint Appendix at 142. There is ample reason to believe that this is generally the case in the mining industry. *See e.g. Consolidation v. Grahum, supra* (extraction pits moved from one and a half to twenty miles from repair shop during the course of employee's career). Repair facilities, on the other hand, tend to be stationary. The distance from the extraction site will necessarily vary as mining operations move from area to area. The important point, however, is that on-site repair facilities are typically situated to be as close as possible to the extraction site without interfering with normal mining operations. Where a mine operator maintains this type of facility for its own benefit, it would be grossly unfair to allow it to escape liability for illnesses which occur as a result of occupational exposure to coal dust and we do not believe that Congress intended such a result. Accordingly, we hold that where a mine operator maintains a repair shop in the general vicinity of one or more extraction sites in order to avail itself of the economies of an on-site repair facility, the shop should be presumed to be "around a coal mine" as defined in section 902(d) of the Act.

Of course, we recognize that this verbal formulation cannot eliminate every ambiguity in every case. There will inevitably be situations where a repair shop is considerably more distant than the situations heretofore considered and a determination of what constitutes an "on-site" facility may be difficult. These determinations must necessarily be left to the reasoned decisionmaking of the administrative law judges. In the final analysis, questions of whether a facility lies within the "coal mine area" are questions of fact. *Baker, supra* at 1300; *Ziegler, supra* at 535. A decision of an administrative law judge should be overturned only if it is clearly in error. *See supra* section II(A). What we have attempted to do is isolate the qualitative factors which we believe give content and meaning to inherently elastic terms such as "around" and "area."

## VI.

In conclusion, we find that the central machine shop in which Petracca worked fell within the statutory definition of the area "around the coal mine." Its close physical proximity with the mine site and the significant and regular exposure of those working in the shop to coal dust make their inclusion in the protection of the Act entirely just and reasonable. Accordingly, the decision of the Benefits Review Board dismissing Consolidation is REVERSED and Consolidation is REINSTATED as the responsible operator.

BOGGS, Circuit Judge, concurring in part and dissenting in part.

I concur in the portion of Judge Cohn's well-reasoned opinion which establishes rules amplifying the "situs" and "function" tests expounded in *Southard* and *Baker*. It appears to me, however, that his analysis of the "situs" requirement requires that the ALJ find that the claimant had some type of contact, however occasional, with the mining operation itself. The opinion, at pages 932–933, seems to contemplate, and in fact relies on cases involving, "frequent contact with the extraction site and accompanying dust exposure." Further, the court emphasizes, at page 934, the integration of repair shops and mines, referring to the "availability of a staff of mechanics who can be called to the pits on short notice." The significance of this integration lies in the proposition that if repairmen, such as Petracca, are frequently required to work at the mines, the probability of harmful dust exposure is vastly increased. The distance between the repair shop and the mine, correspondingly, becomes less important, thus allowing the claimant to meet the "situs" requirement.

In this case, however, while he did discuss the question of whether Petracca worked at the mines, the ALJ did not make any determination as to the integration of the repair shop and any of the pits, or any determination as to the working conditions in the repair shop. After considering the evidence presented on the question of whether the claimant was required to work

at the strip mines, the ALJ concluded: "After thoroughly examining the record, I find that the testimony as it applied to the issue of 'situs,' is inconsistent and unclear." Because the ALJ did not make any findings on the integration issue or the actual dust exposure suffered by the repairmen, I cannot agree on this record that we can say that the ALJ determined, based on our statement of the rule of law, that the claimant actually worked "around" a coal mine. Thus, while I concur in reversing the decision of the Benefits Review Board, I would remand to the ALJ for further proceedings consistent with these views.