**FALCON COAL COMPANY, INC., Petitioner,**

v.

**Corbett CLEMONS, et al., Respondents.**

No. 88–3235.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 6, 1989.

Decided April 26, 1989.

---

Ronald E. Gilbertson, argued, Kilcullen, Wilson & Kilcullen Chartered, Washington, D.C., for Falcon Coal Co., Inc.

Michael A. Stidham, Miller, Stidham & McGrath, Jackson, Ky., for Corbett Clemons.

Michael J. Denney, argued, U.S. Dept. of Labor, Office of the Solicitor, Washington, D.C., for Director, Office of Workers' Compensation Programs, U.S. Dept. of Labor.

Before KRUPANSKY and WELLFORD, Circuit Judges, and JOINER, Senior District Judge.*

WELLFORD, Circuit Judge.

This black lung case involves the interesting question of whether a night watchman at a strip mine is a "miner" as defined

* The Honorable Charles W. Joiner, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

in the Black Lung Benefits Act. Three cases examining this issue have held that watchmen are not miners under the circumstances demonstrated. The panel believes that the regulations support this conclusion. We therefore reverse the Benefits Review Board, which decided this claim to the contrary, and remand for further proceedings consistent with this opinion. Disposition of other issues is settled by the resolution of this question.

On October 3, 1979, Corbett Clemons, petitioner, filed an application for federal black lung benefits in which he stated that he "stopped work in coal mining in 1947." [1] On July 17, 1980, a Department of Labor Deputy Commissioner issued a Notice of Initial Determination, in which the petitioner was found eligible for benefits under the Black Lung Benefits Act. Falcon Coal Company was named as the party responsible for benefit payments. Falcon protested this initial determination and requested a de novo hearing before an Administrative Law Judge (ALJ).

Petitioner's testimony was taken by deposition, and the ALJ awarded benefits, finding that Clemons "worked as a night watchman for a surface (strip) mine operated by the employer for the last six years (1971–1977)." The ALJ also found that prior to Clemons' employment with Falcon, he had worked for approximately ten years (1961–1970) as a night watchman or security guard for another coal company. In addition to his security work, Clemons was found to have worked in the coal industry for approximately four years in various other jobs, some of which were above ground and others of which were in the mines.

With regard to Clemons' employment at Falcon, the ALJ found that Clemons patrolled the grounds in a truck, and was thereby exposed to coal dust. But, the ALJ also noted that "[d]uring the entire period of his coal mine employment, claimant was a heavy cigarette smoker." Specifically, the judge found that Clemons had

a habit of smoking at least one pack of cigarettes per day for a period of some thirty to thirty-five years, despite his complaints about pneumoconiosis.

The ALJ concluded that Clemons was entitled to invoke the interim presumption of total disability due to pneumoconiosis arising out of coal mine employment on the basis of qualifying evidence under 20 C.F.R. § 727.203(a)(1)-(a)(4). Having invoked the interim presumption, the ALJ next considered the issue of rebuttal under 20 C.F.R. § 727.203(b)(3). The ALJ recognized that Clemons suffered from emphysema, and that black lung benefits are not provided for that disease, but only for pneumoconiosis. The ALJ, however, rejected the medical opinions of Drs. Anderson, O'Neill, and Cornish, who attributed claimant's respiratory impairment to cigarette smoking. The ALJ recognized that these three doctors all had extensive experience in diagnosing and treating respiratory and pulmonary diseases, but found that they had not properly considered claimant's twenty-year exposure to coal dust. The opinions of other doctors, who found a significant relationship between the claimant's total disability and his twenty years of "coal mine work," were adopted. Weighing the evidence, the ALJ determined that the interim presumption had not been rebutted, and benefits were awarded.

Falcon appealed the ALJ's decision to the Benefits Review Board, claiming that work as a night watchman did not qualify as work of a "miner" under the Black Lung Benefits Act. Falcon also challenged whether the final Part 718 regulations must be applied under the circumstances; whether it had effectively rebutted the presumption under 20 C.F.R. § 727.203(b)(3); and whether the ALJ erred in finding benefits and interest payable from April 1979.[2]

The Board affirmed the ALJ's finding that the claimant's job as a night watchman qualified as the work of a "miner" under the Act. The majority of the Board

---

1. This information is based upon Clemons' own response to a Department of Labor application form inquiry.

2. The ALJ erroneously stated that the date of filing was April rather than October 1979, and ordered that interest was payable from April.

**919**

held that the Part 727 regulations, rather than the Part 718 regulations, were applicable. The majority also found that the ALJ's award of benefits was supported by substantial evidence, but modified the onset date for benefits to October rather than April of 1979. Finally, the Board rejected Falcon's argument that interest is not payable until thirty days after the issuance of the Deputy Commissioner's initial determination.

One Board member dissented, indicating that in his view the claimant was not a "miner" for the period that he worked as a night watchman. He concluded that, as a matter of law, the position of night watchman does not constitute the work of a miner as defined in § 402(d) of the Act and the applicable regulations, 20 C.F.R. § 725.202(a).

Falcon filed a timely motion for *en banc* reconsideration by the Board on the issue of whether Clemons' work as a night watchman qualified as work of a "miner" under the Black Lung Benefits Act. The Board issued a split decision, in which three members affirmed the Board's original holding that "although all night watchmen might not be coal miners under the Act, under the particular facts of this case, the Administrative Law Judge could properly find that claimant's work was integral to and facilitated the production of coal." Two members dissented, stating that Clemons did not satisfy the "function" prong of the definition of the term "miner." Falcon appeals this *en banc* decision of the Board.

Falcon's records indicate that Clemons was employed as a night watchman at their surface mine from September 30, 1970 through September 16, 1979. He was fifty-four years old at the time he ceased employment at Falcon. Clemons' testimony confirmed that this employment at Falcon consisted exclusively of work as a night watchman. He testified that sometimes conditions were dusty while at other times "there wasn't very much dust." He worked inside a guardhouse provided for

him, but claimed to spend some time outside on the strip mine or driving his truck around the site. Because Clemons worked the night shift, the mine was not always in operation. The ALJ found, however, that the mine was in operation the majority of the time that Clemons was at work.

Clemons testified that he smoked cigarettes for many years. He rolled his own cigarettes and stated that "a can of Prince Albert would last almost a week." [3] Clemons admitted that he continued to smoke until 1982 (long after he applied for benefits), when he was hospitalized for breathing and heart problems.

Dr. P. Sewell examined Clemons on September 20, 1979. Sewell noted claimant's shortness of breath and his indicated employment of nineteen years as a night watchman and "a three (3) year history of coal mining." Dr. Sewell *failed to mention* the claimant's *smoking* history in his report. Sewell diagnosed Clemons as suffering from pneumoconiosis, and concluded that Clemons would be unable to work as a consequence of occupational lung disease. At a deposition conducted on June 25, 1980, Sewell reiterated his findings of pneumoconiosis, but once again failed to acknowledge claimant's cigarette smoking history.

Dr. A. Varghese examined Clemons on November 15, 1979, and noted claimant's employment as a laborer and night watchman in the coal mines, as well as claimant's reported forty-year smoking history. Varghese diagnosed "possible pneumoconiosis" and indicated that it was "possible" that the condition arose out of coal mine employment. His report was inconclusive.

Dr. T. Boneta, a general surgeon who examined Clemons on March 5, 1980, performed a physical examination and also obtained an x-ray, which was interpreted by Dr. Cordero and himself. A spirometry test was not performed. Dr. Boneta diagnosed Clemons as suffering from stage 3 pneumoconiosis and emphysema due to pneumoconiosis. Dr. Boneta's medical records indicate that Clemons reported

**3.** At one point, Clemons testified that he smoked a can of Prince Albert *each day*. He indicated in his deposition, however, that this statement was incorrect, and that he smoked a can of Prince Albert each week.

working at a strip mine for approximately twenty years and being exposed to coal dust. As in the case of Dr. Sewell, Dr. Boneta reflected no knowledge of the claimant's long history of smoking, although Clemons admitted the habit during the examination.

Dr. B. Wright, an anesthesiologist, examined Clemons on July 16, 1980. He reported that Clemons complained of severe shortness of breath, and indicated a habit of smoking one pack of cigarettes a day for thirty-five years. Dr. Wright conducted a physical examination, a chest x-ray, and pulmonary function studies, all of which indicated to him "chronic obstructive pulmonary disease, predominantly emphysematist type associated with smoking and inhalation of respirable dust, severe"; simple pneumoconiosis; and hypertension. Dr. Wright was of the opinion that the claimant's impairment may have been partially due to coal dust exposure, but that his smoking history and hypertension were contributing factors to his symptoms.

Dr. R. O'Neill examined petitioner on April 2, 1980. The history reported by Clemons was that he worked as a strip mine watchman for 20 years, an underground coal miner for five years, and had a habit of smoking approximately one pack of cigarettes a day. Dr. O'Neill reported that Clemons advised him that he had quit smoking prior to the examination, which included a physical, a chest x-ray, and a spirometry test. Based on the results of these studies, Dr. O'Neill diagnosed severe obstructive airway disease, chronic bronchitis, probable emphysema, hypertension, and benign prostatic hypertrophy. In O'Neill's opinion, Clemons' "severe obstructive airway disease is due to cigarette smoking."

Dr. O'Neill expanded upon these findings in a deposition taken on May 6, 1980. The doctor indicated that he was a specialist in internal medicine and pulmonary diseases, including occupational diseases of the lung. Noting claimant's chronic cigarette smoking, Dr. O'Neill stated that his evaluation of Clemons' x-rays were not consistent with pneumoconiosis, but that the claimant's obstructive airway disease was attributable primarily to cigarette smoking.

Dr. W. Anderson examined Clemons on April 23, 1980, noting that Clemons began smoking when he was seventeen years old and smoked a can of Prince Albert a week. His examination included pulmonary function studies, blood gas tests, an EKG, and an x-ray. His final diagnosis found pulmonary emphysema, hypertensive vascular disease, and no evidence of pneumoconiosis or silicosis. Dr. Anderson reconfirmed this diagnosis in a later deposition, explaining that Clemons' emphysema was caused by "a combination of factors." These "factors" included chronic exposure to *cigarette* smoke, which Dr. Anderson believed was the primary cause of Clemons' disability. In a supplemental report, Anderson maintained that it was possible to distinguish with a high degree of medical certainty between disability caused by cigarette smoking and disability caused by exposure to coal dust:

> ... Mr. Clemons' chest x-ray did not reveal any evidence of pneumoconiosis but only revealed evidence of his bilateral emphysema. The only stage of pneumoconiosis that would be capable of causing such a marked reduction in pulmonary function would be massive fibrosis, category C.

Dr. A. Cornish examined Clemons on October 9, 1980. He indicated that the claimant had two years of underground coal mine employment and also worked as a night watchman, but was not exposed to heavy concentrations of dust as a night watchman. A thirty-five year smoking history was indicated. A chest x-ray showed small irregular opacities, which were interpreted to be atypical for coal workers' pneumoconiosis, and therefore, negative for pneumoconiosis. Dr. Cornish's diagnosis included severe bronchitis with pulmonary emphysema and chronic obstructive airway disease. According to Dr. Cornish, this condition was not related to coal dust exposure, but was probably connected to Clemons' cigarette smoking.

Dr. R. Powell examined Clemons on November 24, 1980. Powell indicated that the

claimant worked two years in underground mines and nineteen years on strip mines as a night watchman. He also indicated that the claimant admitted to smoking cigarettes. Dr. Powell reported that physical examination revealed decreased breath sounds with expiatory wheezes. An EKG was interpreted as being abnormal, and a chest x-ray revealed a compression fracture with wedging of the eighth and ninth thoratic vertebrae. This x-ray also revealed increased pulmonary fibrosis, but contained no evidence of pneumoconiosis or silicosis. Dr. Powell concluded that Clemons suffered very severe obstructive ventilatory defect due to pulmonary emphysema, but that Clemons did not suffer from pneumoconiosis or silicosis.

Dr. I. Potter, a general physician, performed an examination of Clemons on December 11, 1980, and was unaware of the claimant's smoking history. Dr. Potter concluded that the claimant had a rather marked respiratory impairment and could not perform any type of manual labor. He did not specifically classify Clemons' condition as pneumoconiosis or emphysema.

The claimant was last examined by Dr. W. Clarke, a cardiovascular disease specialist, on January 13, 1981. Dr. Clarke's examination of Clemons consisted of taking a history, a physical, EKG, spirometric evaluation, and chest x-ray, the latter being interpreted as positive for pneumoconiosis. The pulmonary function studies were interpreted as showing severe obstructive pulmonary disease and severe obstructive airway disease. Dr. Clarke attributed the cause of Clemons' disability to his history of work in a dusty environment. Although Dr. Clarke indicated Clemons had a smoking history of some thirty-five years, Clarke found that "his work in the coal industry" was the cause of the disability. On a cross-examination, however, Clarke conceded that the history of smoking provided to him by the claimant could also account for Clemons' complaint of shortness of breath.

### I. Does a Night Watchman Qualify as a "Miner"?

Section 402(d) of the Black Lung Benefits Act defines "miner" as "any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal." [4] 30 U.S.C. § 902(d). The regulations also provide that in order to qualify as a "miner," an individual must have worked in or around a coal mine or coal preparation plant and must have been involved "in the extraction or preparation of coal." 20 C.F.R. §§ 725.101(a)(26),[5] 725.202(a).[6]

■ The Board and the courts have generally interpreted the statutory definition of "miner" to encompass a two-pronged test. To qualify as a "miner," an individual must establish that: (1) he worked in or around a statutorily defined coal mine (the "situs" test), 30 U.S.C. § 802(h)(2), and (2) his duties involved the extraction or preparation of coal, or involved appropriate coal mine construction or transportation (the "function" test). *Foreman v. Director, OWCP*, 794 F.2d 569, 570 (11th Cir.1986); *Wisor v. Director, OWCP*, 748 F.2d 176, 178 (3d Cir.1984); *Southard v. Director, OWCP*, 732 F.2d 66, 69 (6th Cir.1984); *Amigo Smokeless Coal Co. v. Director, OWCP*, 642 F.2d 68, 70 (4th Cir.1981). The

**4.** The term "miner" also includes an individual who works or has worked in coal mine *construction* or *transportation* in or around a coal mine, to the extent such individual was exposed to coal dust as a result of such employment." 30 U.S.C. § 902(d) (emphasis added).

**5.** 20 C.F.R. § 725.101(a)(2) provides:

"Miner" or "coal miner" means any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal. The term also includes an individual who works or has worked in coal mine construction or transpor-

tation in or around a coal mine, to the extent such individual was exposed to coal dust as a result of such employment....

**6.** 20 C.F.R. § 725.202(a) provides:

A "miner" for the purposes of this part is any person who works or has worked in or around a coal mine or coal preparation facility in the extraction, preparation, or transportation of coal, and any person who works or has worked in coal mine construction or maintenance in or around a coal mine or coal preparation facility.

parties agree that the "situs" test has been met here, but dispute strongly whether work as a night watchman satisfies the "function" test.

Clemons does not claim to have been involved in construction or transportation, and did not engage in activity falling within the statutory definition of "preparation."[7] To qualify under the explicit terms of the Act, therefore, Clemons must have been involved in the "extraction" of coal.

"Extraction" is not defined in either the regulations or the Act. Thus, the term should be given its ordinary and plain meaning. *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 164, 105 S.Ct. 638, 645, 83 L.Ed.2d 556 (1985). According to *Webster's New Collegiate Dictionary* 403 (1981), "extract" means "to draw forth" or "to pull or take out forcibly." We do not find that Clemons' work involved "extraction" as that term is commonly employed because he was not involved sufficiently in the taking out of coal or in mining coal.

Although "the statutory language itself is restrictive," *Wisor v. Director, OWCP*, 748 F.2d 176, 178 (3d Cir.1984), remedial legislation, such as the Black Lung Benefits Act, should be construed broadly. *Stroh v. Director, OWCP*, 810 F.2d 61, 64 (3d Cir.1987); *Adelsberger v. Mathews*, 543 F.2d 82, 84 (7th Cir.1976). Although workers performing duties incidental to the extraction or preparation of coal have met the function requirement and have been considered to be coal miners, these incidental duties must be an "integral" or "necessary" part of the coal mining process.

In *Stroh v. Director, OWCP*, 810 F.2d 61 (3d Cir.1987), a self-employed trucker loaded coal at the mine site, hauled raw coal over public roads to processing plants, and frequently worked underground. He was determined to be a miner eligible for black lung benefits because of his "incidental duties."

In *Southard v. Director, OWCP*, 732 F.2d 66 (6th Cir.1984), a coal retailer who unloaded coal from railroad cars onto trucks was held not to be a miner because he failed the function prong of the definition.

In *Hon v. Director, OWCP*, 699 F.2d 441 (8th Cir.1983), the court held that work in a blacksmith's shop did not constitute work as a miner. In *Skipper v. Mathews*, 448 F.Supp. 300, 302 (M.D.Pa.1977), however, the court stated that even though work performed in the repair shop did not involve the extraction of coal, "[i]t was, however, part of the overall process because coal cannot be extracted without properly functioning equipment." *See also Amigo Smokeless Coal Co. v. Director, OWCP*, 642 F.2d 68 (4th Cir.1981) (holding that a lab technician who collected coal samples for processing and analysis was a miner because collection work constitutes preparation and because chemical analysis is a necessary step in preparing coal for sale).

In *Frost v. Benefits Review Bd.*, No. 85–4034, 821 F.2d 649 (6th Cir. June 26, 1987) (unpublished), a deliveryman who carried lunches to the underground workers was not a miner. The court held that

> [w]hile the mineworkers obviously had to eat, and it was convenient to have someone bring the lunches to the workers, it was not necessary to have the lunches delivered into the mine. This case is simply not like [others] where the *incidental duties were more closely related and necessary to the actual process of extracting or preparing coal.* Frost's duties were too far removed from the extraction or preparation process to be considered qualifying coal mine employment.

Slip op. at 12 (emphasis added).[8]

In general, those individuals who handle raw coal or who perform tasks necessary to keep the mine operational and in repair

---

**7.** "Preparation" is defined as

the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine.

30 U.S.C. § 802(i).

**8.** The claimant in *Frost* also had a smoking habit.

are generally classified as "miners." Those whose tasks are merely convenient but not vital or essential to production and/or extraction are generally not classified as "miners."

■ We find three cases that have considered specifically whether a security guard or night watchman qualifies as a miner. All held that such duties do not encompass the job of "miner." *Director, OWCP v. West Virginia Workers' Compensation Coal–Workers' Pneumoconiosis Fund; Henry J. Lambert,* No. 86–1222, 842 F.2d 1290 (4th Cir. Mar. 8, 1988) (unpublished); *Slone v. Director, OWCP,* 12 Black Lung Rptr. 1–92 (BRB 1988); *Joyce v. Director, OWCP,* BRB No. 80–1542 BLA (June 15, 1984) (unpublished).

In *Lambert,* the claimant worked as a line-shack night-watchman, providing on-site security for coal mining supplies and equipment cached outside the mine entrance, near the tipple. Slip op. at 2. Although the claimant worked the night shift, the mine was operating and he was exposed to coal dust. The ALJ, the Benefits Review Board, and the Fourth Circuit all concluded that the claimant was not a miner under the statutory definition. The court held:

> In determining whether claimant was a miner, all three members of the Board agreed that duties as a line-shack night-watchman fell outside the statutory and regulatory definitions. In applying the function test, the Board agreed unanimously that sitting in a line-shack and watching non-operating equipment was not the equivalent of performing duties integral to coal preparation and extraction.

*Id.* at 6.

In *Slone,* the Board held that the claimant's employment as a night watchman was not qualifying coal mine employment under the Act. 12 Black Lung Rptr. at 1–93. Its decision was based on the claimant's testimony that he "mostly stayed in the trailer and took care of telephone calls coming in,

checking tickets going out," and the ALJ's conclusion that "the claimant was hired to protect and further the commercial interests of his employer and, therefore, his duties were not integral to the coal production process." *Id.* In short, claimant did not meet the "function test" of the statutory definition of "miner."

In *Joyce,* the Board summarily rejected the claimant's contention that his work as a security guard constituted qualifying coal mine employment. According to the Board, "The administrative law judge could properly find that claimant's duties as a mine security guard were not integral to the preparation or extraction of coal." Slip op. at 2.

We are in agreement with the rationale of these three security guard cases even though two are unpublished. We conclude that Clemons' work as a security guard while at Falcon does not qualify him as a "miner" under the Act.[9] A review of the statute, the applicable regulations, and the case law reveals that Clemons, in his capacity of night watchman, did not perform duties integral to the extraction of coal. We agree with the dissent of Chief Administrative Appeals Judge Ramsey:

> In one sense or another, each and every employee of a coal mine operation can be said to be essential or integral to the extraction of coal. If not, common sense would dictate that they would not be retained on the company payroll.... We cannot say, however, that since all employees may be essential to some aspect or other of the overall operation, that they all qualify as "miners."

Joint Appendix at 5 (*en banc*). Although Clemons may have been convenient or helpful to Falcon's operation, he was not necessary to procure coal. Falcon might just as well have installed alarms or other security devices instead of hiring a security guard, because the type of security system used does not affect extraction methods at the mine.

---

**9.** It is also important to note that "exposure to coal dust ... has no relevance to determining whether an individual is a miner." *Nucci v.*

*Director, OWCP,* BRB No. 82–922 BLA (Mar. 26, 1984) (unpublished).

■ Because the number of years Clemons actually worked in or about coal mines as a "miner," is less than ten, the ALJ's invocation of the interim presumption was improper. Accordingly, Clemons, rather than Falcon, should bear the burden of proving that his disability arose out of coal mine employment. 20 C.F.R. §§ 727.203(c), (d), 718.204.

■ Furthermore, because work as a night watchman is nonqualifying work, Clemons was not a "miner" during his tenure at Falcon. Falcon therefore cannot be held responsible for the payment of any black lung benefits Clemons ultimately may be awarded. *See Zavora v. United States Steel Corp.*, 2 BLR 1–1202, 1–1209 to –1210 (holding that an employer who did not employ an individual as a "miner" is not liable for the payment of benefits under the Act). Because Clemons only work as a "miner" occurred, if at all, prior to 1970, the Black Lung Disability Trust must provide any benefits that may be payable. 30 U.S.C. §§ 932(c), 934(a).

## II. *Should Interim or Permanent Regulations be Applied?*

■ Falcon argues that 30 U.S.C. § 931(c) requires that Clemons' claim be evaluated under the permanent regulations set forth at 20 C.F.R. Part 718, rather than the interim regulations contained in 20 C.F.R. Part 727. It asserts that the Secretary should have promulgated the permanent regulations within six months of March 1, 1978, the effective date of the Black Lung Benefits Reform Act of 1977. The Secretary's failure to promulgate the permanent regulations until March 31, 1980, contends Falcon, should not prevent their application to any case filed after the expiration of the statutory deadline. The question of which regulations should be applied in this situation, however, was authoritatively resolved in *Tennessee Consolidated Coal Co. v. Crisp*, 866 F.2d 179 (6th Cir.1989).[10]

Crisp filed his claim for black lung benefits on November 20, 1979. Because the claim was filed before the effective date of the Part 718 permanent regulations, March 31, 1980, the ALJ evaluated it under the interim regulations in Part 727. On appeal, the coal company argued that the Part 727 interim regulations were inapplicable to the case. *Id.* at 181.

The company initially supported its claim for retroactive application of Part 718 by relying on the six-month time limit in § 421(c) of the Act for promulgating final regulations. *Id.; see* 30 U.S.C. § 931(c). In *Youghiogheny & Ohio Coal Co. v. Warren*, 841 F.2d 134, 136 (6th Cir.1987), however, we concluded that § 421(c) controlled only final regulations promulgated pursuant to Part C of the Act. The Part 718 regulations were promulgated under Part A of the Act. *See* 30 U.S.C. § 902(f)(1)(D).

The Secretary of Labor ... drafted the regulations to apply prospectively only, *see* 20 C.F.R. §§ 718.2, 725.4(d) & 727.2(d), and the Benefits Review Board has on several occasions upheld the Secretary's action, *e.g.*, *McFarland v. Peabody Coal Co.*, 8 B.L.R. 1–163 (B.R.B. 1985); *Smith v. National Mines Corp.*, 7 B.L.R. 1–803 (B.R.B.1985). We conclude that the Secretary's reading of the Act is reasonable; under the statute and its legislative history, incorporation of the four month promulgation requirement in section 411(b) to mandate retroactive application of the Part 718 regulations is

**10.** *Tennessee Consolidated Coal Co.* held that retroactive application of Part 718 to a claim for benefits filed prior to March 31, 1980 was not appropriate. In a very recent decision, *Knuckles v. Director, OWCP*, 869 F.2d 996 (6th Cir. 1989), a panel of this court held that Part 718 regulations "are applicable to claims filed before, but adjudicated after, March 31, 1980." 869 F.2d at 998. That panel conceded, however, that its interpretation (on a question "not raised by petitioner") was "inconsistent with the plain language of § 718.2," but held as it did to comport with the "broad, remedial purposes" of the Act. We acknowledge an apparent conflict, but we are satisfied that application of Part 718 regulations, even if appropriate, would not evoke a change in the disposition of this case. Unfortunately, *Knuckles* did not cite *Tennessee Consolidated Coal Co.* or attempt to distinguish it in any way. It did, however, cite *Director, OWCP v. Forester*, 857 F.2d 1121 (6th Cir.1988), as applying Part 410 rather than Part 718, in a somewhat similar situation, and acknowledged that "the Sixth Circuit's position of this issue does not appear entirely settled." *Knuckles*, 869 F.2d at 999.

not "appropriate." 30 U.S.C. § 940. Accordingly, the final regulations in Part 718 may be applied strictly in a prospective fashion.

*Crisp,* 866 F.2d at 181–82.

The ALJ in the instant case, therefore, did not err in applying the Part 727 interim regulations.

Although we have decided this case on the legal issues previously discussed, we add that we have considerable doubt that the medical evidence supports the ALJ's finding of pneumoconiosis in this case. The rejected opinions of Drs. Anderson, Cornish, O'Neill, and Powell constitute strong and persuasive evidence that Clemons was not afflicted with pneumoconiosis, but rather attributed Clemons's respiratory and pulmonary problems to smoking. *See Zimmerman v. Director, OWCP,* 871 F.2d 564, 566 (6th Cir.1989) (indicating that "a miner seeking benefits must show that he or she is totally disabled not merely by a respiratory or pulmonary condition but by pneumoconiosis"). The ALJ rejected these medical opinions because he felt that the doctors "evaluated claimant's respiratory and pulmonary condition as if he had never engaged in coal mining and had not been exposed to the inhalation of coal and rock dust for a period of 20 years." The rejection of Dr. Anderson's opinion is particularly disturbing because he was a "B" reader, *See Lawson v. Secretary of Health and Human Services,* 688 F.2d 436 (6th Cir. 1982), and was "[t]he only Board eligible specialist in internal medicine and pulmonary disease." Dr. Anderson was fully aware of Clemons' work history as a security guard at the mines. We need not decide this difficult issue, however, in light of our other basis for reversal.

We accordingly REVERSE the decision of the Board awarding benefits to Clemons against Falcon Coal Company, Inc. The ALJ's invocation of the interim presumption was improper because the claimant did not demonstrate at least ten years' work as a "miner." Because the claimant did not work as a "miner" for Falcon, Falcon cannot be held liable for any black lung bene-fits which may be payable to Clemons. We REMAND for a determination of whether any other party, including the federal Trust Fund, can be held liable should Clemons be found eligible for benefits without the aid of the interim presumption.