<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 19a0110n.06

Case No. 18-3734

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Mar 08, 2019
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| BIZZACK CONSTRUCTION, LLC, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| JAMES WARREN FANNIN; DIRECTOR, | ) |
| OFFICE OF WORKERS' COMPENSATION | ) |
| PROGRAMS, UNITED STATES | ) |
| DEPARTMENT OF LABOR, | ) |
| | ) |
| Respondents. | ) |

ON PETITION FOR REVIEW OF AN ORDER OF THE BENEFITS REVIEW BOARD

BEFORE: SUTTON, WHITE, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.** Bizzack Construction, LLC's ("Bizzack") primary business is building roads in Appalachia. When doing so, it frequently comes across seams of coal, which it extracts and sells. One of its long-time drill operators, James Fannin, filed a claim for benefits under the Black Lung Benefits Act (the "BLBA") after working for Bizzack for twenty-eight years. The Administrative Law Judge ("ALJ") awarded him benefits, and the Benefits Review Board of the Department of Labor (the "Board") affirmed. Bizzack petitions this Court for review. The Director, Office of Workers' Compensation Programs, U.S. Department of Labor (the "Director") joins this action as a Respondent party in interest. For the reasons stated below, we **DENY** Bizzack's petition.

## I.    BACKGROUND

### A.    Procedural History

Fannin filed his claim for benefits on May 21, 2012, but the District Director issued an order denying his claim on June 3, 2013.  Fannin appealed, and the ALJ held a hearing on May 18, 2016.  The ALJ issued an order awarding benefits to Fannin on April 25, 2017, and the Board affirmed on June 18, 2018.  This petition followed.

### B.    Factual Background

Fannin's primary job with Bizzack was to drill through rock so that it could be excavated for road construction.  When he came upon a seam of coal, he would stop drilling, and he and his co-workers would remove the rocky overburden with dynamite.  Fannin and his co-workers would then clean the coal so that it could be loaded and sold.  Fannin stated that he drilled into coal nearly every day he worked at Bizzack and that his job duties consisted entirely of drilling, loading holes, and cleaning coal.  He stated that if he was not drilling, he was cleaning coal.

Fannin also testified that he was exposed to a significant amount of dust while working for Bizzack.  He stated that, early in his tenure, there was "[n]othing but dust" and that he was exposed to dust on an hourly basis.  At some point, Bizzack supplied Fannin with a temperature-controlled cab that had an air filtration system, which was supposed to reduce the amount of dust to which he was exposed.  However, Fannin testified that the cab was not airtight and that, even when it functioned properly, he would have a half-inch of dust inside the cab after a ten hour shift.  Moreover, he said that the cab was frequently broken.  According to Fannin, the filters did not work once they were obstructed, which happened regularly, and the air conditioner did not run most of the time.  When the air conditioner was out, he had to open the door in order to breathe, and the dust could get so bad that it felt like it was choking him.

John McCoart, a co-worker of Fannin's, corroborated most of Fannin's testimony. McCoart explained that they drilled into coal about "[n]inety percent of the time" and that they always tried to drill into coal seams. He also testified that there was so much dust that, if you took a picture, "you couldn't see what you w[ere] taking a picture of."

Lester Wimpy, Bizzack's executive vice president, testified that Bizzack was primarily involved in "government-funded highway jobs." He said that, while Bizzack did not prospect for coal, it knew where coal would likely be located on its highway jobs. Wimpy averred that Bizzack's main purpose was to complete the contracted-for road project, regardless of whether it would encounter coal, but he admitted that Bizzack would adjust its bid for a job based on the likelihood of recovering coal. Wimpy also produced business records beginning in 1996 that established how much coal was sold on jobs in which Fannin worked.[1] Bizzack sold more than 690,000 tons of coal for a total of $22,849,418.93 during that period. Wimpy attempted to contextualize these numbers, stating that any coal recovered was merely incidental to Bizzack's construction projects because the coal accounted for less than one percent of the total amount of material removed.

Fannin retired from Bizzack in 2009 or 2010. The record is unclear as to exactly when he developed respiratory issues, but he testified that he first went to a doctor in regard to dyspnea in 2012.

During the course of this litigation, Fannin was examined by two physicians and a third reviewed his records and submitted a report. The first doctor that examined Fannin was Dr. Donald Rasmussen, who is board certified in internal medicine, completed a year of pulmonary residency, and practices in pulmonary medicine. On June 25, 2012, Dr. Rasmussen performed several tests

---

[1]Bizzack did not have computerized records before 1996.

on Fannin, all of which were negative for pneumoconiosis, except for an arterial blood gas study that was taken while Fannin exercised. Due to Fannin's work history, Dr. Rasmussen found that Fannin was disabled due to legal pneumoconiosis, which was primarily caused by exposure to coal mine dust.

On August 13, 2012, Fannin saw Dr. Abdul Dahhan, who is board certified in both internal medicine and pulmonary disease. He, too, performed several tests, but according to him, none— including an arterial blood gas that was taken during exercise—showed that Fannin had pneumoconiosis, clinical or legal. Notably, however, Dr. Dahhan measured Fannin's arterial blood gas at the end of the exercise session rather than in the middle of it, as Dr. Rasmussen had done. Additionally, Dr. Dahhan used an "arterial stick" rather than an in-dwelling catheter to obtain the arterial blood for the study, again, contrary to Dr. Rasmussen's method. Dr. Dahhan explained that Fannin's respiratory issues were due to his obesity rather than legal pneumoconiosis. Based on his evaluation, Dr. Dahhan believed that Fannin did not have a pulmonary disability and that he could have returned to his previous job.

In 2016, Dr. Akshay Sood, a board-certified pulmonologist, reviewed Fannin's medical records and submitted a report. Dr. Sood found that Dr. Rasmussen's results were likely more accurate. He opined that, during the exercise test with Dr. Rasmussen, Fannin's heartrate rose to 136 beats per minute, while during Dr. Dahhan's exercise test, Fannin's heart rate did not rise significantly. Additionally, because Dr. Dahhan used the arterial stick method, his test likely underestimated the severity of Fannin's hypoxia during exertion. In conclusion, Dr. Sood determined that Fannin had a disabling lung disease from legal pneumoconiosis for which exposure to coal mine dust was a substantial contributory factor.

## C.    The ALJ's Decision

The ALJ made several findings to support Fannin's award of benefits.  First, he determined that, not counting the time Fannin spent working for Bizzack, Fannin had a little more than six years of work that qualified as coal mine employment—a finding that is unchallenged on appeal. He then found that Fannin worked as a coal miner for a little more than nine years during his tenure with Bizzack.  Thus, the ALJ calculated that Fannin had slightly more than fifteen years of experience working in coal mines.  Based on the discrepancies pointed out by Dr. Sood and certain other inconsistencies in Dr. Dahhan's findings, the ALJ credited the medical opinions of Dr. Rasmussen and Dr. Sood in concluding that Fannin had a respiratory disability.  Therefore, the ALJ imposed the rebuttable presumption that a miner who works for fifteen years or more in a place with conditions substantially similar to an underground coal mine and who has a totally disabling respiratory or pulmonary impairment is totally disabled due to pneumoconiosis.  *See* 30 U.S.C. § 921(c)(4).  Based on the opinions of Dr. Rasmussen and Dr. Sood, the ALJ found that Bizzack had not rebutted the presumption.  Accordingly, the ALJ awarded Fannin benefits under the BLBA.  For the same reasons given by the ALJ, the Board affirmed.

## II.    ANALYSIS

### A.    Statutory Framework

The BLBA provides benefits to coal miners who are totally disabled due to pneumoconiosis, which was caused by exposure to coal mine dust.  *See* 30 U.S.C. § 901 *et seq*. "Pneumoconiosis, commonly called black lung disease, is 'chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment.'" *Zurich Am. Ins. Grp. v. Duncan*, 889 F.3d 293, 296 (6th Cir. 2018) (quoting 30 U.S.C. § 902(b)).  The implementing regulations of the BLBA clarify that there are two forms of

pneumoconiosis, clinical and legal. *Brandywine Explosives & Supply v. Dir., Office of Workers' Comp. Programs*, 790 F.3d 657, 661 (6th Cir. 2015). Clinical pneumoconiosis is defined as "those diseases recognized by the medical community as pneumoconiosis." 20 C.F.R. § 718.201(a)(1). Legal pneumoconiosis is defined as "any chronic lung disease or impairment and its sequelae arising out of coal mine employment." *Id.* § 718.201(a)(2).

To be eligible for "BLBA benefits, a coal miner must prove by a preponderance of the evidence that: (1) he has pneumoconiosis; (2) his pneumoconiosis arose at least in part out of his coal mine employment; (3) he is totally disabled; and (4) the total disability is due to pneumoconiosis." *Navistar, Inc. v. Forester*, 767 F.3d 638, 640 (6th Cir. 2014) (citing 20 C.F.R. §§ 718.201-718.204).

A "coal miner" is defined as a person who (1) has worked in or around a "coal mine," and (2) whose work involved the extraction or preparation of coal. 30 U.S.C. § 902(d); 20 C.F.R. § 725.202(a). A coal mine is defined as "an area of land . . . used in, or to be used in, . . . the work of extracting . . . bituminous coal . . . and the work of preparing the coal so extracted." 30 U.S.C. § 802(h)(2). The "'work of preparing the coal' means the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine[.]" *Id.* § 802(i).

Miners who worked for at least fifteen years in "one or more underground coal mines, . . . [or] in a coal mine other than an underground mine [with] substantially similar . . . conditions to [that of] an underground mine" and who have a totally disabling respiratory condition are entitled to a rebuttable presumption that the miner's disability was caused by pneumoconiosis. 30 U.S.C. § 921(c)(4). The employer can rebut the presumption by demonstrating that the miner either does

not have pneumoconiosis or that the miner's "respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine." *Id.*

In its petition, Bizzack argues that the ALJ erred (1) in finding that Fannin was employed as a coal miner during his tenure with Bizzack, (2) in imposing the fifteen year presumption, and (3) in determining that the record supports a finding that Fannin is totally disabled.

### B.      Standard of Review

We have a mixed but narrow standard of review in these cases. We may only reverse the decision of the Board if it "committed legal error or exceeded its scope of review of the ALJ's findings." *Peabody Coal Co. v. Groves*, 277 F.3d 829, 833 (6th Cir. 2002) (citing *Tenn. Consol. Coal Co. v. Kirk*, 264 F.3d 602, 606 (6th Cir. 2001)). However, "our review actually focuses on whether the ALJ's decision is supported by substantial evidence." *Island Creek Ky. Mining v. Ramage*, 737 F.3d 1050, 1056 (6th Cir. 2013). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Peabody Coal Co.*, 277 F.3d at 833 (quoting *Cross Mountain Coal, Inc. v. Ward*, 93 F.3d 211, 216 (6th Cir. 1996)). "We do not reweigh the evidence or substitute our judgment for that of the ALJ and [w]e will not reverse the ALJ's decision merely because we would have taken a different view of the evidence were we the trier of facts." *Duncan*, 889 F.3d at 299 (alteration in original) (internal quotation marks omitted) (quoting *Ramage*, 737 F.3d at 1056).

"When the question is whether the ALJ reached the correct result after weighing conflicting medical evidence, 'our scope of review . . . is [again] exceedingly narrow. Absent an error of law, findings of facts and conclusions flowing therefrom must be affirmed if supported by substantial evidence.'" *Consolidation Coal Co. v. Worrell*, 27 F.3d 227,

230-31 (6th Cir. 1994) (first alteration in original) (quoting *Riley v. Nat'l Mines Corp.*, 852 F.2d 197, 198 (6th Cir. 1988)).

### C. Coal Mine Employment

Bizzack first asserts that the ALJ erred in determining that Fannin's work constituted coal mine employment. We have "interpreted the statutory definition of a 'miner' to encompass a two-pronged test." *Falcon Coal Co. v. Clemons*, 873 F.2d 916, 921 (6th Cir. 1989). "[A] 'miner,' . . . must establish that: (1) he worked in or around a statutorily defined coal mine (the 'situs' test), 30 U.S.C. § 802(h)(2), and (2) his duties involved the extraction or preparation of coal, or involved appropriate coal mine construction or transportation (the 'function' test)." *Id.* at 921-22.

Bizzack asserts that the ALJ erred under both prongs. Beginning with the situs question, Bizzack's arguments center on two related points: that the extraction of coal was merely incidental to its road-building operations and thus that it did not have a sufficient economic interest in the coal such that it could have been considered to operate a coal mine. The text of the statute does not support Bizzack's arguments.

The operative provision of the BLBA states that a coal mine consists of "land . . . used in, or to be used in, . . . the work of extracting . . . coal . . . and the work of preparing the coal[.]" 30 U.S.C. § 802(h)(2). The undisputed evidence demonstrates that coal was extracted from land in projects on which Fannin worked. While that would seem to end the matter, we have opined previously that, in cases where coal mining is not the primary pursuit in which the business is involved, a claimant can only satisfy the situs prong where coal mining constituted "at least a substantial part of the activity" in which the claimant was engaged. *Montel v. Weinberger*, 546 F.2d 679, 680 (6th Cir. 1976). We clarified this concept in *Hinton v. Director, Office of Workers' Compensation Programs*, where we held that "an employer's lack of economic interest in coal

generated in clay mining is highly relevant in determining whether coal mining was a substantial part of a clay miner's work." 762 F.2d 1008 (6th Cir. 1985) (table) (citing *Wisor v. Director, Office of Workers' Compensation Programs*, 748 F.2d 176 (3d Cir. 1984)). In this case, the inverse is true—Bizzack's considerable economic interest is highly relevant to our determination that coal mining was a substantial part of Fannin's work. The record establishes that Bizzack planned to harvest the coal that it encountered on its road projects so that it could sell that coal. Bizzack even admitted that it would lower its bid on certain projects based on its projected coal recovery, and that, over a twelve year span, it sold the coal from projects on which Fannin worked for more than $20,000,000.00. Moreover, Fannin and McCoart both testified that they spent a significant amount of time extracting and cleaning coal when they worked for Bizzack. Thus, there is substantial evidence to support the ALJ's finding that the road projects on which Fannin worked qualified as work in or around a coal mine, satisfying the situs prong.[2]

As to the function prong, Fannin's duties must have been an "'integral' or 'necessary' part of" the coal extraction or preparation. *Clemons*, 873 F.2d at 922. Extraction is not defined in the BLBA, but we have previously held that it means to "to draw forth' or 'to pull or take out forcibly.'" *Id.* (quoting *Webster's New Collegiate Dictionary* 403 (1981)). Bizzack contends that

---

[2]In reaching his conclusion, the ALJ relied on *Smith v. Director, OWCP*, a 1986 decision by the Board in which it cited *Montel* and *Hinton* for the proposition that an employer must have a "sufficient economic interest in coal" for the employer to be considered a coal mine. In its brief, Bizzack spends considerable effort arguing that the ALJ did not explain why Bizzack's economic interest was "sufficient." Given that the Board in *Smith* simply recharacterized the test we applied above, this argument is meritless.

Bizzack also posits the argument that an agreement between the Mine Safety and Health Agency ("MSHA") and the Occupational Safety and Health Administration ("OSHA") purports to show that MSHA "surrendered regulatory authority over road construction projects on which coal is uncovered to [OSHA.]" According to Bizzack, this is supporting evidence that its road projects were not coal mines. For numerous reasons, this argument is, likewise, meritless. First, the plain language of the agreement makes clear that MSHA did not give up any of its jurisdiction over mine sites covered by the Mine Act; it merely attempted to clarify situations in which the agencies' regulatory authority might be ambiguous. *See* Interagency Agreement between the Mine Safety and Health Admin. U.S. Dep't of Labor and the Occupational Safety and Health Admin. U.S. Dep't of Labor (1979), https://www.osha.gov/laws-regs/mou/1979-03-29. Second, the agreement only specifies which agency has regulatory authority in certain situations; it does not regulate the distribution of benefits under the BLBA. *Id.* Finally, the agreement pertains to mines defined under 30 U.S.C. § 802(h)(1), not § 802(h)(2)—the applicable provision here. *Id.*

the ALJ erred here because Fannin's work was merely incidental to any coal extraction. To the extent this assertion is even relevant to our analysis, it is belied by the record.

As noted above, Bizzack intended to encounter, retrieve, and sell coal on its road jobs. Fannin testified that he hit a coal seam almost every day he worked, and when he hit a seam, he would stop drilling and assist in the removal of the rocky overburden so that the coal could be extracted. Fannin would then clean the coal in preparation for it to be loaded and shipped. Thus, there is substantial evidence to show that, by Fannin drilling down to the coal seam, assisting in the removal of the overburden, and cleaning the coal, he was an integral part of Bizzack's extraction and preparation of the coal. *See* 30 U.S.C. § 802(i) ("'[W]ork of preparing the coal' means the . . . cleaning . . . of bituminous coal . . . .").

### D. The Fifteen Year Presumption

Bizzack's next argument is that the ALJ erred in imposing the fifteen year presumption. Because Fannin did not work in an underground coal mine while at Bizzack, he had to establish that the conditions in which he worked were substantially similar to those in an underground coal mine. 30 U.S.C. § 921(c)(4). The phrase "substantially similar" is not defined in the BLBA, but the Department of Labor promulgated a regulation interpreting it: "The conditions in a mine other than an underground mine will be considered 'substantially similar' to those in an underground mine if the claimant demonstrates that the miner was regularly exposed to coal mine dust while working there." 20 C.F.R. § 718.305(b)(2). Bizzack argues that the evidence does not show that Fannin was regularly exposed to coal mine dust because (1) Bizzack supplied him with a cab, and (2) the dust to which Fannin was exposed came mainly from rocks, not coal. We disagree on the first count, and the second is immaterial as a matter of law.

To begin, Fannin testified that, before he got the cab, he was exposed to a substantial amount of dust. This contention is uncontroverted. Next, even after he got the cab, he had to leave the cab open on hot days. Moreover, Fannin averred that, when the cab was functional, it was not airtight and that there would be a half-inch of dust inside the cab after a shift. Finally, Fannin testified that the cab was in frequent disrepair, which Wimpy's testimony could have been interpreted as supporting. Therefore, the record establishes that, even after Bizzack supplied Fannin with a cab, Fannin was regularly exposed to dust.

As to Bizzack's assertion that the ALJ erred because Fannin was exposed to more rock dust than coal dust, we have previously rejected this precise argument. *Brandywine Explosives & Supply*, 790 F.3d at 665 ("[Petitioner's] proposed distinction between coal dust and rock dust has no merit."). Thus, the ALJ's finding that Fannin was regularly exposed to coal mine dust was supported by substantial evidence.

### E. Fannin's Disability

Bizzack's last argument is that the ALJ impermissibly found that Fannin established that he had a total respiratory disability. Substantial evidence supports the ALJ's finding.

The regulations define a totally disabled miner as one who

has a pulmonary or respiratory impairment which, standing alone, prevents or prevented the miner:

(i) From performing his or her usual coal mine work; and

(ii) From engaging in gainful employment in the immediate area of his or her residence requiring the skills or abilities comparable to those of any employment in a mine or mines in which he or she previously engaged with some regularity over a substantial period of time.

20 C.F.R. 718.204(b)(1).

In his report, Dr. Rasmussen determined that Fannin's previous work required heavy manual labor, and based on the arterial blood gas study that Dr. Rasmussen obtained, both Dr. Rasmussen and Dr. Sood concluded that Fannin was totally disabled because he could not perform heavy manual labor.[3] The ALJ relied on these opinions, stating that Fannin's previous employment required a "heavy exertional level" and that Fannin was totally disabled because he could not have performed a job requiring a heavy exertional level at the time of the hearing. While Dr. Dahhan's opinion was to the contrary, the ALJ did not err by discounting it because the evidence supported a finding that Dr. Rasmussen's arterial blood gas was collected using more reliable methods. Therefore, the ALJ reasonably afforded little to no weight to Dr. Dahhan's opinion that Fannin was not totally disabled. Accordingly, there is substantial evidence to support the ALJ's finding that Fannin was totally disabled.

### III. CONCLUSION

For the reasons stated above, we **DENY** Bizzack's petition.

---

[3]Notably, Bizzack does not argue that an arterial blood gas measurement taken during exercise is an improper ground upon which to diagnose legal pneumoconiosis or that it was error for the ALJ to accept Dr. Rasmussen's and Dr. Sood's determination that Fannin's pneumoconiosis arose out of coal mine employment.