**NEWPORT NEWS SHIPBUILDING AND DRY DOCK COMPANY, Petitioner,**

**v.**

**George A. PARKER; Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.**

**No. 90–3109.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1991.

Decided April 5, 1991.

Lawrence Philip Postol, argued (James M. Mesnard, on brief) Seyfarth, Shaw, Fairweather & Geraldson, Washington D.C., for petitioner.

Joshua T. Gillelan, Office of the Sol., U.S. Dept. of Labor, Washington, D.C., for respondents.

Robert P. Davis, Sol. of Labor, Carol A. De Deo, Associate Sol., Janet R. Dunlop, Washington, D.C., for Longshore.

Marianne Demetral Smith, Office of the Sol., U.S. Dept. of Labor, Washington D.C., for respondent Director.

Robert E. Walsh, Rutter & Montagna, Norfolk, Va., for respondent Parker.

Before HALL and WILKINS, Circuit Judges, and COPENHAVER, U.S. District Judge for the Southern District of West Virginia, sitting by designation.

COPENHAVER, District Judge:

Newport News Shipbuilding & Dry Dock Co. (Newport News) appeals a decision and order of the United States Department of Labor Benefits Review Board (the Board) reversing an Administrative Law Judge (ALJ) decision denying benefits to George A. Parker under the Longshore and Harbor Workers' Compensation Act (the Act), 33 U.S.C. §§ 901, *et seq.* Newport News appeals the following rulings: (1) the Board's affirmance of the ALJ's decision that the Act's one-year statute of limitations for a traumatic injury does not commence to run until the claimant knows or has reason to know of the likely impairment of his earning capacity; (2) the Board's reversal of the ALJ's finding that the statute of limitations on Parker's claim commenced running on November 8, 1979, and its further finding that the statute did not begin to run until June 1987; and (3) the Board's holding that the doctrine of laches is not applicable under the Act. We affirm the Board's decision and order on each assignment of error.

## I.

George Parker, a rigger, began working for Newport News at its shipyard on July 10, 1961. On October 31, 1962, Parker's right knee was injured, resulting in a fracture of the patella. He was discharged from treatment with no disability on February 16, 1963. Parker's knee pain did not totally abate, however, and he was treated intermittently for knee pain at the shipyard clinic until September 1978, some fifteen years after the initial injury. After a knee x-ray on March 23, 1978, Parker was told that his symptoms of pain were related to the 1962 fracture.

On September 14, 1978, Parker was referred to Dr. Ryder, an orthopedist, who diagnosed chondromalacia patella, an abnormal softening of the ligaments of the knee. Dr. Ryder commenced periodic treatment of Parker, giving him injections and other medications. On November 8, 1979, Dr. Ryder indicated in a letter to the medical director of Newport News that "[i]t is quite possible that to finally solve the problem an arthrotomy and shaving of the patella will be necessary." There is no evidence that this information was provided to Parker. Treatment by Dr. Ryder continued until November 4, 1980, at which time Dr. Ryder indicated that Parker's symptoms were being controlled by medication and no further appointments were necessary.

Several years later, on May 13, 1987, Parker returned to the clinic with the same complaints of knee pain. He was referred to Dr. Nevins, another orthopedic surgeon.

Dr. Nevins diagnosed chondromalacia patella and restricted Parker's climbing. At a follow-up visit Dr. Nevins recommended arthroscopic surgery inasmuch as Parker's job required climbing. The surgery was performed on July 6, 1987, and Parker returned to light work on August 24, 1987. On a follow-up visit on October 13, 1987, Dr. Nevins recommended a permanent work restriction of no climbing and limited walking and bending. Prior to the surgery, Parker did not lose time from work as a result of his knee problems after recovering from the initial fracture in 1962.

Parker's claim for compensation was filed in 1988. He seeks temporary total disability compensation for a seven-week period commencing with the July 6, 1987, surgery through his return to light work on August 24, 1987, at the rate of approximately $68.75 per week, for a total of approximately $320.[1]

A hearing on Parker's claim was held before an ALJ on August 3, 1988. Based on medical reports that Parker's complaints of constant pain were not consistent with findings on examination, the ALJ concluded that Parker had a tendency to exaggerate. In addition, the ALJ found that Parker's testimony that he believed the doctors when they told him "he would be all right" was not trustworthy. The ALJ also found Parker highly "work-motivated." The ALJ further determined that the years of pain should have alerted Parker that his injury was serious and likely to lead to loss of wage-earning capacity, even if the prognosis was favorable. Based on these considerations, the ALJ found that "on November 8, 1979, after at least six examinations and treatments by Dr. Ryder ... [Parker], exercising reasonable diligence, should have known of the seriousness of his injury and the likelihood of loss of wage-earning capacity. Therefore, the time for filing a claim for compensation expired on November 8, 1980." Inasmuch as Parker delayed filing his claim for almost seven years beyond that date, the claim was denied. The ALJ also held that because the Act contains a specific statute of limitations, the doctrine of laches does not apply.

Parker appealed and Newport News cross-appealed to the Board. Parker claimed that the ALJ's finding that "he knew or should have known that his 1962 injury would result in a loss of wage-earning capacity by November 8, 1979, is irrational and not supported by substantial evidence of record because none of the physicians he consulted anticipated any disability prior to his July 1987 surgery and because he did not lose time from work until the surgery." Newport News contended that the ALJ erred in finding that the doctrine of laches did not bar Parker's claim.

The Board affirmed the ALJ's determination that the statute of limitations under § 13(a) does not begin to run until claimant knows or has reason to know of the likely impairment of his earning capacity. However, the Board reversed the ALJ's determination that Parker knew or should have known of the likely impairment on November 8, 1980, finding instead that the statute of limitations did not commence to run until the arthroscopic surgery was scheduled in June of 1987. Consequently, the Board reversed the ALJ's denial of benefits and awarded temporary total disability benefits from July 6, 1987, to August 23, 1987. The Board further affirmed the ALJ's ruling that the doctrine of laches does not apply under the Act. This appeal followed.

## II.

■ The Act empowers the Board to "determine appeals raising a substantial question of law or fact," with the ALJ's findings of fact deemed "conclusive if supported by substantial evidence in the record considered as a whole." 33 U.S.C. § 921(b)(3); *Newport News Shipbuilding & Dry Dock v. Director, OWCP*, 681 F.2d 938, 941 (4th Cir.1982). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Our review of the Board's determination on findings of

---

1. The loss is based upon Parker's salary in 1962. The amount of the claim is not in dispute here.

facts is to insure that the Board did not exceed the limited scope of its authority by overturning ALJ findings of fact that are supported by substantial evidence. *Marathon Oil Co. v. Lunsford,* 733 F.2d 1139, 1141 (5th Cir.1984). Both the Board and this court have plenary authority to correct errors of law. *Director, OWCP v. Consolidated Coal Co.,* 884 F.2d 926, 929 (6th Cir.1989).

### III.

Section 13(a) of the 1984 amendment to the Act, which governs the statute of limitations applicable to Parker's claim, provides in relevant part:

> [T]he right to compensation for disability ... shall be barred unless a claim therefore [sic] is filed within one year after the injury.... The time for filing a claim shall not begin to run until the employee ... is aware, or by the exercise of reasonable diligence should have been aware, of the relationship between the injury ... and the employment.

33 U.S.C. § 913(a).

In the view of Newport News, the plain language of § 13(a) establishes that the statute of limitations for a traumatic injury begins to run when an employee is aware or should be aware that he has sustained a work-related injury. Newport News also asserts that by adding specific and different statute of limitations language for occupational disease claims in the 1984 Amendment[2] and failing to make corresponding changes for traumatic injuries, Congress indicated its intent that the injury rather than the disability[3] commence the running of the limitations period for traumatic injuries.

In support of its position, Newport News quotes the following portions of the Report from the House Committee on Education and Labor in discussing the proposed changes:

> Section 13 currently provides that "the right to compensation for disability or death shall be barred unless a claim therefore [sic] is filed within one year after the injury or death." The term "injury" in both these provisions has little applicability in the context of a disability or death which is the result of a longlatency occupational disease, and this language has resulted in decisional law which the Committee finds troublesome.
>
> . . . .
>
> Since it is the disability which should trigger the compensation claim, the Committee notes that unlike traumatic occurrences, the period of time between "injury" and the arising of a compensation claim in such a long latency occupational disease case may be so long as to make the requirement that the employee file a Notice of Injury within thirty days of the "injury," nonsensical.
>
> . . . .
>
> To the same effect, triggering the statute of limitations for the filing of compensation claims on the date of "injury" makes little sense in the context of an occupational disease in which the disabling condition or the death does not follow immediately on the "injury". Under the current practice, claimants are most of-

**2.** The 1984 Amendment added the following provision for occupational disease claims:

> [A] claim for compensation for ... disability due to an occupational disease which does not immediately result in such death or disability shall be timely if filed within two years after the employee or claimant becomes aware, or in the exercise of reasonable diligence or by reason of medical advice should have been aware, of the relationship between the employment, the disease, and the ... disability.

33 U.S.C. § 913(b)(2).

**3.** The terms "injury" and "disability" are defined under § 2 of the Act:

> (2) The term "injury" means accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury, and includes an injury caused by the willful act of a third person directed against an employee because of his employment.
>
> . . . .
>
> (10) "Disability" means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment.

33 U.S.C. at § 902(2).

ten forced to file compensation claims before they are disabled, or the extent of their disability is fully known in order to protect their rights under the statute. Accordingly, the Committee bill amends section 13(a) of the Act to toll the running of the statute of limitations for individuals whose claims may be based on long-latency diseases until the employee is actually partially or totally disabled as defined below, or has died.

*H.R. Rep.* No. 98–570, 98th Cong., 1st Sess., at 10–11 (1983).

■ Newport News accordingly maintains that both the Board and the ALJ erred in applying an interpretation of § 13(a) enunciated in *Stancil v. Massey,* 436 F.2d 274 (D.C.Cir.1970). Newport News contends that *Stancil* ignored the explicit language of the statute then in effect and the ruling of the United States Supreme Court in *Pillsbury v. United Engineering Co.,* 342 U.S. 197, 72 S.Ct. 223, 96 L.Ed. 225 (1952),[4] and that the intent of Congress in enacting the 1984 Amendment was to return to the Supreme Court's interpretation of the statute in *Pillsbury.*

In *Pillsbury,* the Supreme Court rejected the petitioners' position that the limitations period under § 13 did not begin to run until the worker's injury became compensable; that is, he was disabled because of the work-related injury. The Court noted that the claimants before the court did not have a "latent injury or an occupational disease," and, consequently, the one-year limitations period commenced running on the date of injury rather than the date of disability. In reaching its conclusion, the Court stated:

> We are not free, under the guise of construction, to amend the statute by inserting therein before the word "injury" the word "compensable" so as to make "injury" read as if it were "disability." Congress knew the difference between "disability" and "injury" and used

the words advisedly. This view is especially compelling when it is noted that the two words are used in the same sentence of the limitations provision; therein "disability" is related to the right to compensation, while "injury" is related to the period within which the claim must be filed. Furthermore, Congress defined both "disability" and "injury" in the Act, and its awareness of the difference is apparent throughout. Thus, we think that when Congress used "disability" and "injury" in the same sentence, making each word applicable to a different thing, it did not intend the carefully distinguished and separately defined words to mean the same thing. Congress meant what it said when it limited recovery to one year from date of injury, and "injury" does not mean "disability."

> We are aware that this is a humanitarian Act, and that it should be construed liberally to effectuate its purposes; but that does not give us the power to rewrite the statute of limitations at will, and make what was intended to be a limitation no limitation at all .... While it might be desirable for the statute to provide as petitioners contend, the power to change the statute is with Congress, not us.

*Id.* at 199–200, 72 S.Ct. at 224–225.

Eighteen years later, in *Stancil,* the District of Columbia Circuit Court of Appeals held that the one-year limitations period does not commence to run until the employee reasonably believes that he has "suffered a work-related harm which would probably diminish his capacity to earn his living." *Stancil,* 436 F.2d at 274. In *Stancil,* the employee sustained a work-related back injury, diagnosed as a sprain, in January 1959. He was released from medical care in May 1959 and returned to work with no disability. His back pain continued, however, and surgery was required in 1962. The surgery revealed that the back

---

4. When *Pillsbury* and *Stancil* were decided, the relevant portion of § 13(a) provided: "The right to compensation for disability under this Act shall be barred unless a claim therefor is filed within one year after the injury." The additional language that the time for filing the claim will not begin to run until the employee "is aware, or by the exercise of reasonable diligence should have been aware, of the relationship between the injury ... and the employment" was added by amendment in 1972.

injury had actually caused two herniated discs and Stancil thereafter filed a claim for disability benefits more than four years after the accident occurred.[5]

In deciding the question of when the limitations period commenced to run, the court construed the term "injury" to mean "the harmful physical ... consequences of [an accidental] event which need not occur or become obvious simultaneously with the event." *Id.* at 276. The *Stancil* court observed that the bill which became § 13 had been amended to substitute "injury" for "accident" as the triggering event. *Id.* (citing *Pillsbury*, 342 U.S. at 203 n. 5, 72 S.Ct. at 226 n. 5 (Burton, J., dissenting)). The court concluded that "injury" was intended to be a more flexible term than "accident" and, construing the term liberally, judged:

> "[I]njury" should encompass physical harm of a kind which is unknown to the employee at the time of the accident but which is later revealed, such as an occupational disease or a latent wound. The general theory of the limitations provision is, as we understand it, that the workman should not dawdle too much in filing a claim once he knows (or should know) that there is something wrong with him of a nature which will potentially affect his ability to earn his preexisting wage.... Conversely, there is no intimation that Congress, contrary to its humanitarian aim, wished to penalize the employee who reasonably does not know that he has suffered harm which will, or may well, reduce his earning capacity. In short, once the man has been put on the alert (*i.e.*, once he knows or has reason to know) as to the likely impairment of his earning power, there is an "injury"; before that time, while there

may have been an accident, there is as yet no "injury" for claim or filing purposes under this statute.

*Id.* at 277. Applying its construction of the term "injury," the court held that Stancil had no "injury" for which to file a claim until his back problem was diagnosed as a herniated disc. *Id.* at 278. Prior to that time, based upon the medical advice he received, he could reasonably believe that his recurring pain would dissipate without lasting effect. *Id.* The court explained that its holding was not contrary to *Pillsbury* in that the Supreme Court did not undertake in *Pillsbury* to "construe the term 'injury' for latent injury cases" and "explicitly disclaimed any intention of deciding that question ... by excluding latent injury cases from the purview of its decision."[6] *Id.* at 279.

In the aftermath of *Stancil* and the 1972 amendment, *see supra*, note 4, courts addressing the question uniformly began applying the *Stancil* rule that the limitations period for traumatic injury does not commence running until the employee knows or should know of the likely impairment of his earning capacity. *See Cooper Stevedoring, Inc. v. Washington*, 556 F.2d 268, 274 (5th Cir.1977); *Todd Shipyards Corp. v. Allan*, 666 F.2d 399, 401–02 (9th Cir.), *cert. denied*, 459 U.S. 1034, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982) (upholding the Board's application of *Stancil*); *Marathon Oil Co. v. Lunsford*, 733 F.2d 1139, 1141 (5th Cir. 1984) (1972 amendment changes *Pillsbury* rule. "Under the amendment we look to the employee's appreciation of the relation between his injury and his employment. For [the statute] to run against him, he must know (or should know) the true nature of his condition, i.e., that it interferes with his employment by impairing his ca-

---

**5.** In a sense, the facts in *Stancil* indicate that his injury was misdiagnosed and several cases thereafter focused on "misdiagnosis" as grounds for tolling the limitations period. However, *Stancil* itself makes clear that its holding is not based upon the "correctness of the diagnosis *per se*," although the opinion of one's doctor can properly form the basis of an employee's belief that his injury will probably not diminish his capacity to earn his wages. *Stancil,* 436 F.2d at 279.

**6.** Newport News counters that an examination of the lower court decisions reveals that one of the claimants in *Pillsbury* had a latent hand injury which he treated himself and for which he had lost no time from work and yet the Court barred his claim when it was not filed within one year. Notwithstanding that observation, the language in *Pillsbury* evidences the Court's intent to exclude latent injuries from its ruling. *See supra*, p. 24.

pacity to work, and its causal connection with his employment.") (citing *Cooper Stevedoring* and *Todd Shipyards* )).

Nor have the courts considering the question undertaken to change the well-established *Stancil* rule in the wake of the 1984 amendment and its separate provision for occupational diseases. *E.g., Brown v. I.T.T./Continental Baking Co.*, to be reported at 921 F.2d 289 (D.C.Cir.1990) (restating the *Stancil* rule that an "injury" does not occur for purposes of determining when the claimant became aware " 'of the relationship between the injury ... and the employment' " (quoting 33 U.S.C. § 913(a)) until he "knows or should have known that the accident he has suffered will probably impair his ability to earn his previous wage"); *J.M. Martinac Shipbuilding v. Director, OWCP*, 900 F.2d 180, 183–84 (9th Cir.1990) (citing *Bechtel Associates, P.C. v. Sweeney*, 834 F.2d 1029, 1033 (D.C.Cir. 1987)); *Lunsford*, 733 F.2d at 1141 and relying on both the 1972 amendment and *Stancil* in holding that "the time for filing does not being [sic] to run until the employee is aware that his or her injury has resulted in the impairment of his or her earning power); *Brown v. Jacksonville Shipyards, Inc.*, 893 F.2d 294, 296 (11th Cir.1990) (triggering event is claimant's knowledge "that there was an injury which constituted an impairment of earning power. The fact that the claimant has suffered an accident and is aware that he is injured is not the test; the test is the awareness of the suffering of a compensable injury"); *Sweeney*, 834 F.2d at 1033 (1972 amendment means "that the limitation period begins only when the employee knows or should know that (1) his injury is causally related to his employment and (2) his injury is impairing his capacity to earn wages") (citing *Lunsford, Todd Shipyards* and *Stancil* ). [7]

Newport News cites no authority to the contrary. In addition, with respect to the argument that the 1984 Amendment indicates congressional intent to return to the *Pillsbury* rule, it is equally likely that Congress was satisfied with the judicial decisions on traumatic injuries and, consequently, found it unnecessary to make any changes except for the addition of explicit language dealing with the more difficult problems encountered in claims for occupational diseases. Moreover, the legislative history of the 1984 Amendment to which Newport News makes reference does not support the proposition that Congress would have a latent traumatic injury treated in a manner inconsistent with the considerations it sought to make expressly applicable to occupational diseases. Given the policy considerations underlying the Act, it is unlikely that Congress would conclude that "disability" should "trigger the compensation claim" for occupational disease because of its long latency period and at the same time take the position that the date of accident should trigger the claim for a latent traumatic injury. As the Committee noted, one of the purposes of amending § 13 for occupational diseases was to avoid the problem of requiring an employee to file a compensation claim before he is disabled in order to protect his rights.

Arguably, the Committee was satisfied that the 1972 amendment and subsequent judicial interpretations were sufficient to avoid that undesirable result for traumatic injuries. Inasmuch as congressional inaction may mean several things, including satisfaction with the existing state of the law, the failure to modify the requirements for traumatic injury cannot be fairly interpreted as a congressional mandate to return to the rule enunciated in *Pillsbury*. Rather, the more reasonable explanation for the 1984 Amendment is that Congress sought to clarify its intent with respect to

7. Although this court has not directly addressed when the statute of limitations commences to run on a latent traumatic injury, it has held in the context of an occupational disease claim that a doctor's misdiagnosis tolls the running of the limitations period because the period does not begin to run until the employee is "aware of

the nature and gravity of his true injury." *Newport News Shipbuilding & Dry Dock Co. v. Director, OWCP*, 583 F.2d 1273, 1280 (4th Cir. 1978), *cert. denied*, 440 U.S. 915, 99 S.Ct. 1232, 59 L.Ed.2d 465 (1979) (citing *Cooper Stevedoring* and *Stancil* ).

occupational diseases and similarly provide that the claim need not be filed until such time as the claimant knows or should know that his disease is likely to impair his capacity to earn wages.

For the reasons stated, the Board did not err in relying upon *Stancil* and holding that Parker's time for filing his claim under § 13(a) did not commence to run until he knew or had reason to know that his 1962 injury was likely to impair his earning capacity.[8]

### IV.

Newport News next contends that the ALJ's determination that the statute of limitations commenced to run on November 8, 1979, is supported by substantial evidence and the Board exceeded its scope of review by substituting its own findings for those of the ALJ. Newport News points to Parker's frequent visits to the shipyard clinic, his persistent knee pain, and the necessity of referral to an orthopedist in 1978 as the substantial evidence supporting the ALJ's finding. Reference is also made to Dr. Ryder's letter of November 8, 1979, the date chosen by the ALJ as the date the limitations period commenced to run, notifying the shipyard clinic that arthroscopic surgery might be necessary.

██ As noted by the Board, the experiencing of pain after an accident is insufficient as a matter of law to establish an awareness of a likely impairment of earning power. *E.g.*, *J.M. Martinac*, 900 F.2d at 184; *Lunsford*, 733 F.2d at 1141. Here, not only did Parker work, notwithstanding his pain, from 1962 until November 8, 1978, but he continued working almost nine more years before his condition reached the stage that he was required to miss time from work. The only logical explanation for the ALJ's choice of November 8, 1978, as the date the statute of limitations period began to run is the suggestion in Dr. Ryder's letter of that date that surgery might be necessary in the future. However,

there is no evidence to contradict Parker's testimony that the possibility was not conveyed to him. Moreover, Dr. Ryder himself seems to have changed his prognosis, for after another year of conservative treatment, he concluded that Parker's symptoms were being adequately controlled by medication and a return appointment was not necessary.

The prospect of surgery did not arise again until June 1987, seven years after Dr. Ryder last examined Parker. During that time, Parker's knee problems did not cause any loss of work time. Inasmuch as Parker was able to work with his pain for twenty-five years, including nine years after the date chosen by the ALJ as the time he should have known that his earning capacity would be diminished, there was no substantial evidence to support the ALJ's decision. Consequently, the Board did not exceed the scope of its review in reversing the ALJ's determination on the grounds that it was not supported by substantial evidence and concluding instead that Parker did not have reason to know of the likely impairment of his earning capacity until Dr. Nevins arranged surgery for him in 1987.

### V.

Newport News alternatively maintains that the line of Board decisions holding that laches is not a defense under the Act should be reversed and that Parker's claim should be denied on the grounds that his delay in filing the claim was excessive and prejudicial to its ability to defend against it.

██ The equitable doctrine of laches precludes the prosecution of stale causes of action if the party bringing the action lacks diligence in pursuing his claim and the party asserting the defense has been prejudiced by that lack of diligence. *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961). In *Lewis v. Norfolk Shipbuilding & Dry Dock Co.*, 20 B.R.B.S. 126 (1987), the Board held that

---

**8.** Inasmuch as we agree with the Board that the statute of limitations on Parker's claim did not commence running until he knew or should have known of the likely impairment of his earning capacity, it is not necessary to address the Department of Labor's alternate contention that Parker's injury falls within the statute of limitations governing occupational diseases.

because of the specific statutory limitations period under the Act, the doctrine of laches does not apply.

█ It is not necessary to determine whether the Board's position is correct for Newport News would not be able to avail itself of the defense here in any event. Inasmuch as the Board properly held that Parker's claim was timely, it follows that Newport News cannot demonstrate lack of diligence by Parker. Moreover, Newport News is unpersuasive in its argument that it has been prejudiced. It had notice from the outset that Parker suffered a work-related injury. Parker's continuing problems were also fully known to the shipyard's clinic, including the prognosis as early as 1979 that surgery might ultimately be necessary. Given that Newport News was privy to as much information about his injury as Parker himself knew, it cannot claim that lack of activity on the part of Parker prejudiced its defense of this claim. Consequently, the doctrine of laches would not change the results here.

The decision and order of the Benefits Review Board is affirmed.

AFFIRMED.